William PATTON by his next friend Dr. Hylan Lewis, Plaintiff,

v.

James DUMPSON et al., Defendants.

No. 75 Civ. 4922.

United States District Court, S. D. New York.

Jan. 3, 1977.

Marcia Robinson Lowry, Children's Rights Project, New York Civil Liberties Union, New York City, for plaintiff.

W. Bernard Richland, Corp. Counsel by Carmela Ackman, New York City, for defendants Dumpson, Parry, Beine and Dall.

Donald J. Cohn, Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendant Remer.

Fredrick J. Magovern, Bodell, Gross & Magovern, New York City, for defendant Schneider.

## MEMORANDUM AND ORDER

OWEN, District Judge.

This motion is one addressed to the sufficiency of the complaint. The complaint alleges as follows: that plaintiff William Patton is a ten year old mentally retarded black child. In 1969, at age three, he was abandoned by his mother, having been abused and neglected by her. He had scars upon his body, was non-verbal and was not

toilet trained. Under appropriate provisions of the New York Social Services Law, William came into the care of officials of the City of New York with the responsibility for abandoned children.[1] These City officials, in turn, placed William with the Children's Aid Society, which placed him as a boarder with the New York Foundling Hospital, which operates a shelter for children.[2]

When William entered the Foundling Hospital at age three, he showed signs of mental retardation which, it is alleged, were apparent to the staff at the Foundling Hospital. It is further alleged that the Foundling Hospital did not test William for the existence of metabolic disorders until almost two years later, notwithstanding alleged medical practice that children showing such signs be tested immediately.

The tests when administered showed William to have homocystinuria, an inherited metabolic disorder which causes continuing physical damage unless diagnosed and properly treated. Upon learning of his condition, the Children's Aid Society placed William in a foster home supervised by their agency with a direction to control his diet, which is an appropriate method of treatment. Two months later, the Children's Aid Society learned that William was deteriorating and that his foster mother did not wish to keep him. However, it is alleged that Children's Aid Society left William in that foster home for some four months until in August of 1973, he was admitted to Bellevue Hospital, in poor condition. At Bellevue, apparently his condition was bettered within a month and he was returned to the same foster home. However, two months later, his diet not being followed, the Children's Aid Society placed William in a second foster home, apparently only licensed to care for children under the age of three. William was at that time seven years old. Some two months later, William had to be readmitted to Bellevue, again in poor physical condition, and was apparently again restored to health within a month. However, for approximately the following two years, William was left in Bellevue Hospital as a resident in the Pediatric Metabolic Unit, being classified as a "boarder baby."[3] and he usually was the only "in patient." The complaint does not specify the number of "out patients." It is alleged that William spent most of his waking hours under the supervision of a nurse who, it is claimed, "usually does not allow him to have toys and it is alleged he received virtually no attention and no supervised training or remediation."

Subsequent to the filing of this complaint, William was adopted, having been placed by a new placement agency, the L. C. Spaulding for Children. Spaulding specializes in placing "unadoptable" children and had taken over his case during the summer of 1975. (New York Times, Saturday, December 13, 1975 at 23, col. 4).[4]

This action, commenced in William's name by "his next friend," Dr. Hylan Lewis, a professor of sociology at Brooklyn College, alleges facts which, if true, tell a tragic tale of child neglect and abuse by a mother, negligent medical management by those charged with responsibility in the premises, and improper placement and neglect of this young boy's education from his eighth to tenth years.

The complaint alleges various constitutional bases for federal jurisdiction. There is concededly no diversity of citizenship. Unless the plaintiff can support one or

---

1. These City officials are James Dumpson and Carol Parry.

2. The law requires that the care of each child shall be reviewed annually by the City officials initially responsible for that child's care.

3. According to an article appearing in the *New York Times* and attached to plaintiff's memorandum of law "[m]any of [the staff at Bellevue] had fought for Willie during his two years at Bellevue. They had blocked what staff members said was an attempt by the Children's Aid Society to put him in an institution for the retarded. 'We believed he needed a home'. . . ." (New York Times, Saturday, Dec. 13, 1975 at 1, col. 2–3).

4. Since William's adoption, his prayers for declaratory and injunctive relief are moot and all that remain are his requests for damages.

more constitutional grounds for jurisdiction, this action, assuming the evidence supports the allegations, is essentially one sounding in tort, medical malpractice and possibly breach of a third party beneficiary contract, and is only properly cognizable in the courts of the State of New York.

Plaintiff's main thrust is that William has been denied his constitutional right to treatment, guaranteed by the Fourteenth Amendment, principal reliance being placed upon *Martarella v. Kelley,* 349 F.Supp. 575 (S.D.N.Y.1972).

■ Assuming, without deciding, that all the defendants are chargeable with having acted under color of state law, and assuming further, without deciding, that there is a constitutional right to treatment which would include all the various kinds of wrongs to William that plaintiff claims, *but see O'Connor v. Donaldson,* 422 U.S. 563, 573, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1974), *id.* at 578–589, 95 S.Ct. 2486 (Burger, C. J., concurring); *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 762 (E.D.N.Y.1973), I conclude that the failure to properly treat one single person does not allege a violation of the constitutional right to treatment. Were this the rule, every medical malpractice claim under color of state law would become a case cognizable in a United States District Court as a constitutional claim. The Court is not open for the hearing of individual negligence claims involving those in state custody or care, as a constitutional matter. The right to treatment doctrine is one that permits the Court to intervene where there is an absence or inadequacy of a *program* of treatment for an entire group of people who have found themselves in state custody or care. It is the absence or inadequacy of the program that permits a federal court to intervene.

> This [right to treatment] requires only the establishment of a program, institution-wide in scope, for developing and formulating individual treatment plans; it of course does not require the formulation, in this suit, of each individual plan.

*Wyatt v. Aderholt,* 503 F.2d 1305, 1316 (5th Cir. 1974).

■ From the complaint, it is not even clear what "treatment" William was denied. While at the New York Foundling Hospital, the only "treatment" it is alleged William was denied was an early diagnosis of his homocystinuria. While in foster care, the only "treatment" it is alleged William was denied was a failure on the foster parents' part to maintain his required diet. This failure would belong, if anywhere, under William's constitutional right to be free from harm. William's two year stay at Bellevue would involve, not a violation of his "right to treatment," but a possible denial of a statutory right to an education without due process, and generally improper placement.

The complaint in this case, viewed against the foregoing, fails to state a cause of action alleging a denial of a right to treatment of constitutional proportions, and this cause of action, ¶ 65, is therefore dismissed.

■ For his second cause of action, plaintiff contends that by being kept at Bellevue for almost two years he has been denied his right to receive services in the least restrictive manner, ¶ 66. While the existence of such a right has been recognized by some district courts, *see, e.g., Welsh v. Likins,* 373 F.Supp. 487, 501 (D.Minn.1974), *Woe v. Mathews,* 408 F.Supp. 419 (E.D.N.Y.1976), the Supreme Court has previously rejected this theory as not constituting a substantial federal question, *State v. Sanchez,* 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970), *dismissing for want of substantial federal question,* 80 N.M. 438, 457 P.2d 370 (1968). In any event, I question the applicability of the doctrine of *Welsh* and *Woe, supra* to this situation, where the State has not confined someone but merely assumed the duties of a substitute parent.

■ The federal courts cannot become the ultimate arbiters of the "correctness" of every individual placement decision made by the states in their role as parens patriae for abandoned children. The second cause of action, ¶ 66, is dismissed.

■ Plaintiff contends that he has been denied the right to an education without due process during the two years he was at Bellevue as well as during some portion of the time he was in foster care. In light of existing New York constitutional[5] and statutory[6] provisions, it is clear that William possesses a state-created right to an education which is protected by the due process clause of the Fourteenth Amendment. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Defendants' motion to dismiss the third cause of action, ¶ 67, is therefore denied.

■ For his fourth cause of action, ¶ 68, plaintiff alleges that in unnecessarily confining William in Bellevue Hospital for almost two years, defendants violated his constitutional right to be free from harm while in the custody of the State and its agents. His fifth cause of action, ¶ 69, alleges violation of this right to be free from harm, inter alia, from a failure to treat his illness while he was in foster care.

There is some imprecision in a test which requires a determination of the harm against which an inmate must be protected, or "civilized standards of humane decency" or the level of a "tolerable living environment" or the conditions which "shock the conscience" of the court. However, these are the standards that have been applied in determining constitutional rights.

*New York Ass'n for Retarded Children v. Rockefeller,* 357 F.Supp. at 765.

Unlike the situation at Willowbrook State School involved in the *Retarded Children* case, *supra* nothing alleged in this complaint rises above allegations of mere negligence in treatment, or differences of individual opinion[7] as to what would be best for William. This does not give rise to a federal civil rights claim. *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir. 1972). Plaintiff's fourth and fifth causes of action, ¶¶ 68 and 69 are, therefore, dismissed.

The failure to diagnose William's homocystinuria for almost two years after being placed at the New York Foundling Hospital in another of the wrongs alleged in ¶ 69 as a violation of William's "constitutional right . . . to be free from harm while in the custody of the state and its agents . . . ." This failure of diagnosis must also be the basis for the cause of action against the Foundling Hospital (through Sister Marian Cecilia Schneider, individually and as administrator of the New York Foundling Hospital) for alleged violation of William's right to treatment, since the only allegations against the Foundling Hospital involve this failure to diagnose William's condition for almost two years.

■ This single failure, though it may have been a continuing omission, sounds in tort and medical malpractice and does not rise to the level of a constitutional violation. There being no other basis for federal jurisdiction over defendant Schneider, ¶¶ 65 and 69 are dismissed as to her. The two pendant state claims against her, ¶¶ 75 and 76 arise from the same operative fact, the failure of diagnosis. These pendant state claims are also dismissed, as the federal claims remaining against the other defendants do not arise from a "common nucleus of [law and] fact" as demanded by *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See also Almenares v. Wyman,* 453 F.2d 1075, 1083 (2d Cir. 1971).

■ Plaintiff contends that he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment. However, the allegations of the complaint simply do not rise to the level necessary to state a violation of the Eighth Amendment. *See Martarella v. Kelley,* 359 F.Supp. 478, 481 (S.D.N.Y.1973). The sixth cause of action, ¶ 70, is therefore dismissed.

---

5. N.Y.Const. art. XI, § 1.

6. *See generally,* New York Education Law, Title 4, art. 65 and Title 6, art. 89 (McKinney 1969).

7. *See* fn. 3 *supra.*

While not clearly pleaded, the thrust of plaintiff's complaint, ¶¶ 71–74, is that William had been improperly placed since becoming a ward of the State, and further, that such improper placement was caused by an alleged custom, pattern and practice of racial discrimination. Such discrimination, if proved, would be a violation of William's right to equal protection. While there is no constitutional right to "proper placement" per se, the State and its agents when seeking to place children in its custody must do so in a non-discriminatory manner.

However, plaintiff's complaint, in alleging a pattern and practice of racial discrimination, is merely conclusory and thus insufficient:

> As a general rule notice pleading is sufficient, but an exception has been created for cases brought under the Civil Rights Acts. The reason for this exception is clear. In recent years there has been an increasingly large volume of cases brought under the Civil Rights Acts. A substantial number of these cases are frivolous or should be litigated in the State courts; they all cause defendants—public officials, policemen and citizens alike—considerable expense, vexation and perhaps unfounded notoriety. It is an important public policy to weed out the frivolous and insubstantial cases at an early stage in the litigation, and still keep the doors of the federal courts open to legitimate claims.

*Valley v. Maule,* 297 F.Supp. 958, 960 (D.Conn.1968). Therefore, plaintiff's claims of racial discrimination are dismissed with leave to file an amended complaint by January 20, 1977.

Since the only remaining federal claim involves the narrow issue of William's education, the two pendant state claims, ¶¶ 75[8] and 76,[9] no longer arise from a "common nucleus of [law and] fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct.

1130, 1138, 16 L.Ed.2d 218 (1966) and are therefore dismissed without prejudice.

Defendant Schneider's motion to disqualify plaintiff's counsel, Marcia Lowry, for conflict of interest is denied as without merit.

The foregoing is so ordered.

---

**8.** Against Remer, Poe and Woe.

**9.** Against Remer, Poe, Woe, Dumpson, Parry, Beine, Dall, Doe and Roe.