OPINION OF THE COURT
Kaye, J.
In Hoffman v Board of Educ. (49 NY2d 121) and Donohue v Copiague Union Free School Dist. (47 NY2d 440), we dismissed complaints for educational malpractice, holding that as a matter of public policy the courts would not second-guess the professional judgments of public school educators and administrators in selecting programs for particular students. In the appeal before us plaintiff, who never learned to read despite a public school education, seeks damages from his legal custodians for his failure to receive an appropriate education. While he urges that there are material differences from Hoffman and Donohue, we conclude that the same policy considerations bar recovery.
In 1964, when plaintiff, Frank Torres, was seven years old, his mother abandoned him and defendant New York City Department of Social Services (DSS) assumed responsibility for his care. DSS placed him with defendant Little Flower Children’s Services, an authorized child care agency (Social Services Law, §371, subd 10), which assumed a contractual obligation to provide him basic care, including room and board, and “the arrangement, as needed, of religious training, education and vocational training.” At the time, plaintiff was fluent in Spanish but spoke and understood little English. Little Flower enrolled *124 him in a public school operated by the New York City Board of Education on the agency’s premises. Plaintiff admitted that he started to understand English “around the third grade.” While he was capable of doing math work at a normal level, he began doing poorly in reading. According to a report submitted by Little Flower to DSS, plaintiff was determined in a 1967 psychological study to suffer from borderline retardation. In light of his perceived condition, teachers at the public school assigned him a lesser work load but for the most part kept him in the regular classes, allowing him to sit in back of the classroom without participating in the instruction. Plaintiff’s reading problem was regularly discussed at conferences attended by Little Flower staff members as well as the school principal and teachers. Little Flower felt that the public school was equipped to deal with th is type of learning disability and did not attempt to provide supplemental reading instruction, except for a short period after seventh grade when plaintiff attended a special class.
In March 1972, a Little Flower social worker took plaintiff to a reading specialist who administered a series of tests with a view toward establishing an education plan to be initiated after plaintiff’s graduation from eighth grade in June 1972. The reading specialist concluded that plaintiff was not retarded but suffered from an “extremely complex reading disability.” He said, “To outline a remedial approach for Frank would be synonymous with writing a textbook.” However, he did recommend a method which had been described in detail in a designated publication.
Following the testing, plaintiff was tutored through the use of reading machines but he graduated from the eighth grade unable to read. The method recommended by the reading specialist was never implemented. However, Little Flower did arrange for further tutoring upon plaintiff’s graduation from grammar school. After some months, plaintiff stopped attending the tutoring sessions because no transportation was provided and the walk took approximately 45 minutes each way. In October 1972, plaintiff was enrolled in a BOCES school and placed in a class for the educable retarded, but he was expelled, after various difficulties in March 1973. Little Flower discharged plaintiff from its care in 1976.
Alleging that he was functionally illiterate, plaintiff brought this action against DSS, Little Flower, several individuals associated with them, and the Board of Education and school principal (the last two since dropped from the suit). He charged that defendants were negligent and violated the contract between *125 DSS and Little Flower in failing to provide him with an appropriate education, and asserted a cause of action based on 42 USC § 1983 because he was not afforded a hearing with respect to the deprivation of an appropriate education. On defendants’ motions for summary judgment, Special Term dismissed the complaint, characterizing the negligence claim as educational malpractice and finding the contractual duties met by the placement of plaintiff in a public school. The court did not address the constitutional claim. The Appellate Division affirmed, without opinion, and this court granted leave to appeal. We now affirm.
In Donohue v Copiague Union Free School Dist. (47 NY2d 440, supra), plaintiff brought an action against the school district because he was graduated from high school unable to comprehend written English. He alleged that the school failed to evaluate his mental ability or take adequate remedial measures to deal with his learning disability. The court assumed that a tort action for educational malpractice could be stated, but nonetheless held as a matter of public policy that courts should not entertain such claims because to do so “would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly, to sit in review of the day-to-day implementation of these policies.” (Id., at p 445.) In Hoffman v Board of Educ. (49 NY2d 121, supra), plaintiff was mistakenly diagnosed as retarded by a psychologist whose recommendation for retesting was ignored. As a result, plaintiff, a person of normal intelligence, was educated in a class for children with retarded mental development. The court found the negligence cause of action grounded in educational malpractice and therefore barred by Donohue, stating “the courts of this State may not substitute their judgment, or the judgment of a jury, for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools” (id., at pp 125-126). As we noted, “the court system is not the proper forum to test the validity of the educational decision to place a particular student in one of the many educational programs offered by the schools of this State” (id., at p 127).
Plaintiff advances several arguments in an effort to distinguish Hoffman and Donohue. First, he asserts that those decisions prevented only suits against educators whereas here the charges are asserted against those responsible for his upbringing. Second, drawing an analogy to Klostermann v Cuomo (61 NY2d 525), he argues that he is not asking the court to evaluate *126 different educational approaches but rather to enforce duties imposed on defendants principally by statute and common law. Those arising from statute — the Social Services Law and the Education Law — in general (1) require DSS to care for abandoned children and supervise child care agencies, which in turn must arrange for appropriate education, and (2) allow DSS or the agency to obtain administrative review of decisions made by the school regarding a variety of programs available to needy children.[1] The common-law duties, it is argued, stem from DSS’s parens patriae function and from Little Flower’s responsibility for plaintiff’s daily care. A third distinction offered is that defendants breached their contract, which obligated Little Flower to provide education “as needed,” to comply with the Social Services Law, and to submit to DSS a detailed service plan concerning plaintiff’s care. The contract also required DSS to supervise plaintiff’s treatment. Finally, plaintiff asserts a deprivation of due process of law.
We cannot accept plaintiff’s initial argument that even if an action grounded in educational malpractice may be barred by public policy considerations when brought against the school, a different result should obtain when this same claim is lodged against the child’s legal custodians. What is at the root of the policy enunciated in Hoffman and Donohue is not the identity of the defendant but the nature of the determinations courts would be called upon to make. This policy is equally applicable whether the student challenges educational decisions made by the Board of Education or by his guardians in response to actions taken by school officials, for in either situation the court would be thrust into the position of reviewing the wisdom of educators’ choices and evaluations. Here, for example, plaintiff’s allegations would require the courts to assess the nature of his difficulty in learning, including such elusive factors as his own attitude, motivation, temperament, past experience and home environment (see Donohue v Copiague Union Free School Dist., 47 NY2d 440, 446 [Wachtler, J., concurring], supra), to examine Board of Education policies and their implementation by school *127 officials — the very role we have already declined to assume — and then in addition to determine whether the guardians’ responses to these policies and decisions constituted negligence.[2] While we have noted the right of students and parents to question choices made by educators (id., at p 445; Hoffman v Board of Educ., 49 NY2d 121,127, supra), we did not imply that the exercise of such a right would give rise to damage suits for negligence.
Plaintiff’s reliance on Klostermann v Cuomo (61 NY2d 525, supra) is misplaced. There, we held that courts would entertain mandamus proceedings and declaratory judgment actions brought to compel administrative agencies to carry out clearly defined, ministerial acts mandated by the Legislature — furnishing written service plans — even where in determining how to act — i.e., the content of those plans — agencies may have unreviewable discretion. Plaintiff points to no clearly defined, ministerial act mandated by the Legislature which defendants failed to perform. The statutes here require DSS and Little Flower to provide for a suitable or appropriate education and allow them to challenge the school’s decisions regarding the programs in which the student is enrolled. Contrary to plaintiff’s claim, defendants did act pursuant to their duty to provide for plaintiff’s education by placing him in a public school maintained by the Board of Education. What is challenged by plaintiff, but not subject to review, is the agency discretion in the manner in which the statutory duty was fulfilled.[3]
Nor are more specific duties imposed by the government’s parens patriae function to safeguard the best interests of children placed in its care, or Little Flower’s responsibility to *128 exercise reasonable care for their protection. Social service agencies or foster parents have been found liable in instances where abandoned children placed in foster care have been physically injured due to abuse or neglect (see, e.g., Bartels v County of Westchester, 76 AD2d 517; Andrews v County of Otsego, 112 Misc 2d 37), but liability has not been extended to judgments concerning a child’s education. On this question, defendants urge that the only duty of those in a parental relation is to cause the child to “attend upon instruction” (Education Law, § 3212, subd 2, par b). We need not define the responsibility of a legal custodian with respect to a child’s education, however, for we assume, as we did in Donohue, that under traditional tort law concepts defendants could be held answerable for their failure to assure plaintiff an appropriate education. Even accepting plaintiff’s argument that defendants have such a responsibility, still his claim must fail because of the public policy against educational malpractice claims. Whatever the precise statutory and common-law duties of a child’s governmental guardians may be, they do not support an action stemming from the alleged malpractice of public school educators and administrators because such an action is not cognizable in our courts.
For the same reason, plaintiff’s cause of action based on contract must also fail; enforcement of the contract as requested would require the court to decide which educational programs might have been preferable. That the source of such a duty was imposed by contract, rather than common law or statute, could not overcome the policy objections to the courts’ involvement in these matters (Paladino v Adelphi Univ., 89 AD2d 85). A different question would be posed if the contract required specified services, for instance, a designated number of hours of instruction (id., at p 92).
Finally, plaintiff cannot succeed on his constitutional claim that he was deprived of his State-created entitlement to an “appropriate” education without a hearing. Plaintiff does not complain that he was deprived of any particular program he was then enjoying (see Board of Regents v Roth, 408 US 564; compare Goss v Lopez, 419 US 565). Further, the “entitlement” at issue cannot be determined through the application of objective criteria. Rather, it depends upon the decisions of professional educators as to the needs of a particular student. Such nebulous entitlements do not lend themselves to protection through the procedural due process requirement. Indeed, they do not even come into existence until the discretionary determination as to what is appropriate is made. Though a due process protection *129 may well apply when the child is not placed in school at all (see Patton v Dumpson, 425 F Supp 621, 625), no such claim may be advanced here. (See, also, Donohue v Copiague Union Free School Dist., 47 NY2d 440, 443, supra.)
Plaintiff acknowledges that recovery is precluded against the Board of Education, the party charged with actually furnishing his public school education and thus primarily at fault if he indeed received a deficient education. For the reasons set forth in Hoffman and Donohue recovery for this same alleged injury cannot be permitted against plaintiff’s legal custodians. The order of the Appellate Division dismissing the complaint should therefore be affirmed.

., For example, DSS has the duty to care for abandoned children (Social Services Law, § 398, subd 2, par [b]), to provide suitable vocational training in certain circumstances (Social Services Law, § 398, subd 6, par [k]) and to supervise the institution in which the child is placed (Social Services Law, § 398, subd 6, par [g]). The child care agency must arrange for the child to receive a suitable education (18 NYCRR 441.13 [formerly 5.19]). Either organization may seek administrative review of any decision made by school officials (Education Law, § 310), including those with respect to special services available for handicapped children (current version codified at Education Law, § 4402).

. Contrast Snow v State of New York (64 NY2d 745). In Snow, plaintiff was under three years of age when he was admitted to the Willowbrook State School, an institution where the “patients” received continuous medical and psychological treatment, where plaintiff’s record resembled a hospital or medical record rather than a school report, and where payment for treatment was made under his father’s medical plan. Plaintiff was deaf, but his condition was not diagnosed. Instead, he was given an intelligence test inappropriate for deaf children, resulting in his mistaken institutionalization and consequent injury. The Appellate Division upheld plaintiff’s cause of action as grounded in medical, rather than educational, malpractice. While mistaken evaluations are central to both Snow and Torres, such factors as age of the child upon entry, nature of the institution and kind of care administered mark the difference between medical and educational malpractice claims.

. The dissent points to the various obligations the law imposes on defen- . dants to determine a child’s special needs (dissenting opn, at pp 131-132). Plaintiff’s underlying contention is not that defendants ignored any specific statutory direction to conduct reviews, for the record indicates that they conferred periodically about plaintiff’s problem, but that they erroneously concluded that the public school was equipped to deal with him.