OPINION OF THE COURT
Jasen, J.
The significant issue presented on this appeal is whether considerations of public policy preclude recovery for an alleged failure to properly evaluate the intellectual capacity of a student.
The facts in this case may be briefly stated. Plaintiff Daniel Hoffman entered kindergarten in the New York City school system in September, 1956. Shortly thereafter, plaintiff was examined by Monroe Gottsegen, a certified clinical psychologist in the school system, who determined that plaintiff had an intelligence quotient (IQ) of 74 and recommended that he be placed in a class for Children with Retarded Mental Development (CRMD). Dr. Gottsegen was, however, not certain of his findings. The apparent reason for this uncertainty was *124 that plaintiff suffered from a severe speech defect which had manifested itself long before plaintiff entered the school system. Plaintiff’s inability to communicate verbally made it difficult to assess his mental ability by means of the primarily verbal Stanford-Binet Intelligence Test administered by Dr. Gottsegen. As a result, Dr. Gottsegen recommended that plaintiff’s intelligence "be re-evaluated within a two-year period so that a more accurate estimation of his abilities can be made.”
Pursuant to Dr. Gottsegen’s recommendations, plaintiff was placed in a CRMD program. While enrolled in the program, plaintiff’s academic progress was constantly monitored through the observation of his teachers and by the use of academic "achievement tests” given twice a year. Although in 1959 and 1960 plaintiff received a "90 percentile” rating as to "reading readiness”, indicating that his potential for learning to read was higher than average, the results of his achievement tests consistently indicated that he possessed extremely limited reading and mathematical skills. As a result of plaintiff’s poor performance on the standardized achievement tests and, presumably, because his teacher’s daily observations confirmed his lack of progress, plaintiff’s intelligence was not retested on an examination designed specifically for that purpose.
In 1968, plaintiff was transferred to the Queens Occupational Training Center (OTC), a manual and shop training center for retarded youths. The following year plaintiff’s mother requested, for the first time, that plaintiff’s intelligence be retested. Plaintiff was administered the Wechsler Intelligence Scale for Adults (WAIS). The results of the test indicated that plaintiff had a "verbal” IQ of 85 and a "performance” IQ of 107 for a "full scale” IQ of 94. In other words, plaintiff’s combined score on the WAIS test indicated that he was not retarded. Inasmuch as his course of study at the OTC was designed specifically for retarded youths, plaintiff was no longer qualified to be enrolled. As a result, plaintiff was allowed to complete the spring semester of 1969, but was not allowed to return in the fall.
Thereafter, plaintiff commenced this action against the Board of Education of the City of New York, alleging that the board was negligent in its original assessment of his intellectual ability and that the board negligently failed to retest him pursuant to Dr. Gottsegen’s earlier recommendation. Plaintiff *125 claimed that these negligent acts and omissions caused him to be misclassified and improperly enrolled in the CRMD program which allegedly resulted in severe injury to plaintiffs intellectual and emotional well-being and reduced his ability to obtain employment. At trial, the jury awarded plaintiff damages in the amount of $750,000. The Appellate Division affirmed this judgment, two Justices dissenting, as to liability, but would have reversed this judgment and required plaintiff to retry the issue of damages had he not consented to a reduction in the amount of the verdict from $750,000 to $500,000. The Appellate Division predicated its affirmance upon defendants’ failure to administer a second intelligence test to plaintiff pursuant to Dr. Gottsegen’s recommendation to "re-evaluate” plaintiffs intelligence within two years. The court characterized defendants’ failure to retest plaintiff as an affirmative act of negligence, actionable under New York law. There should be a reversal.
At the outset, it should be stated that although plaintiffs complaint does not expressly so state, his cause of action sounds in ’’educational malpractice”. Plaintiffs recitation of specific acts of negligence is, in essence, an attack upon the professional judgment of the board of education grounded upon the board’s alleged failure to properly interpret and act upon Dr. Gottsegen’s recommendations and its alleged failure to properly assess plaintiffs intellectual status thereafter. As we have recently stated in Donohue v Copiague Union Free School Dist. (47 NY2d 440), such a cause of action, although quite possibly cognizable under traditional notions of tort law, should not, as a matter of public policy, be entertained by the courts of this State. (47 NY2d, at p 444.)
In Donohue, this court noted that "[c]ontrol and management of educational affairs is vested in the Board of Regents and the Commissioner of Education (NY Const, art V, § 4; art XI, § 2; Education Law, §§ 207, 305; see Matter of New York City School Bds. Assn. v Board of Educ., 39 NY2d 111, 116; Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ., 23 NY2d 483, 485).” (47 NY2d, at p 444.) In that case, the court was invited to undertake a review not only of broad educational policy, but of the day-to-day implementation of that policy as well. We declined, however, to accept that invitation and we see no reason to depart from that holding today. We had thought it well settled that the courts of this State may not substitute their judgment, or the judgment of a *126 jury, for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools. (Donohue v Copiague Union Free School Dist., 47 NY2d 440, 444, supra; James v Board of Educ., 42 NY2d 357, 366.) Indeed, we have previously stated that the courts will intervene in the administration of the public school system only in the most exceptional circumstances involving "gross violations of defined public policy”. (Donohue v Copiague Union Free School Dist., 47 NY2d 440, 445, supra; Matter of New York City School Bds. Assn. v Board of Educ., 39 NY2d 111, 121, supra.) Clearly, no such circumstances are present here. Therefore, in our opinion, this court’s decision in Donohue is dispositive of this appeal.
The court below distinguished Donohue upon the ground that the negligence alleged in that case was a failure to educate properly or nonfeasance, whereas, in that court’s view, the present case involves an affirmative act of misfeasance. At the outset, we would note that both Donohue and the present case involved allegations of various negligent acts and omissions. Furthermore, even if we were to accept the distinction drawn by the court below, and argued by plaintiff on appeal, we would not reach a contrary result. The policy considerations which prompted our decision in Donohue apply with equal force to "educational malpractice” actions based upon allegations of educational misfeasance and nonfeasance.
Our decision in Donohue was grounded upon the principle that courts ought not interfere with the professional judgment of those charged by the Constitution and by statute with the responsibility for the administration of the schools of this State. In the present case, the decision of the school officials and educators who classified plaintiff as retarded and continued his enrollment in CRMD classes was based upon the results of a recognized intelligence test administered by a qualified psychologist and the daily observation of plaintiff’s teachers. In order to affirm a finding of liability in these circumstances, this court would be required to allow the finder of fact to substitute its judgment for the professional judgment of the board of education as to the type of psychometric devices to be used and the frequency with which such tests are to be given. Such a decision would also allow a court or a jury to second-guess the determinations of each of plaintiff’s teachers. To do so would open the door to an examination of *127 the propriety of each of the procedures used in the education of every student in our school system. Clearly, each and every time a student fails to progress academically, it can be argued that he or she would have done better and received a greater benefit if another educational approach or diagnostic tool had been utilized. Similarly, whenever there was a failure to implement a recommendation made by any person in the school system with respect to the evaluation of a pupil or his or her educational program, it could be said, as here, that liability could be predicated on misfeasance. However, the court system is not the proper forum to test the validity of the educational decision to place a particular student in one of the many educational programs offered by the schools of this State. In our view, any dispute concerning the proper placement of a child in a particular educational program can best be resolved by seeking review of such professional educational judgment through the administrative processes provided by statute. (See Education Law, § 310, subd 7.)
Accordingly, the order of the Appellate Division should be reversed and the complaint dismissed.