DONALD SNOW, Respondent, v STATE OF NEW YORK, Appellant.

Second Department, December 27, 1983

APPEARANCES OF COUNSEL

*Robert Abrams*, Attorney-General (*Michael S. Buskus* and *Jeremiah Jochnowitz* of counsel), for appellant.

*Robert L. Ellis* (*John B. Clarke* and *Roger Bohrer* of counsel), for respondent.

## OPINION OF THE COURT

WEINSTEIN, J.

In November, 1976, a claim was brought against the State of New York by claimant Donald Snow, both individually and by his parent and natural guardian, Donald M. Snow,[*] to recover damages emanating from the then infant claimant's admission and confinement to Willowbrook State School from June, 1965 to August, 1972 and at Suffolk State School from August, 1972 to December 31, 1974. The claimant was born prematurely on August 20, 1962 to a mother who had a family history of epilepsy. Subsequent to his birth, Donald was hospitalized for a period of 103 days. Subsequent to his discharge, the infant underwent repeated hospitalizations. It became apparent that his development was slower than normal. In December, 1964, Donald was institutionalized at the Brunswick Home for Mental Defectives, from which he was discharged in May, 1965. He was admitted to Willowbrook in June, 1965.

As per the notice of claim, Donald Snow had been illegally admitted, detained and confined at Willowbrook and the Suffolk State School and had suffered mentally and physically as a result of incompetent supervision, negligent and incompetent treatment, wanton negligence in the examination, treatment and diagnosis of the infant claimant during his admittance and confinement, and failure to educate or train him. It was further alleged that the State had been wantonly negligent in the retention, supervision and maintenance of the infant claimant, both in medical treatment and in general over-all conditions of his confinement. Claimants initially sought damages in the amount of $1,000,000 for each of the following elements: (1) the pain and suffering, both physical and mental, sustained by the infant claimant during his confinement; (2) violation of his civil rights with respect to his admission and incarceration; (3) damages as a result of the retardation and corruption of the normal learning process allegedly resulting

---

[*] Inasmuch as the notice of claim contained no allegation of damages suffered by the infant's father, nor was proof offered at trial regarding the existence of any such damages, the Court of Claims, in its decision, *sua sponte* dismissed the claim of Donald M. Snow individually and limited the claim to that of Donald Snow, the son, who was, by that time, no longer an infant.

from inadequate medical treatment and loss of contact with normal society; and (4) breach of contract. Despite the fact that the claim set forth numerous tortious acts allegedly committed by the State, the case was submitted to the court by claimants' attorney solely upon the theories of medical malpractice and negligent supervision and care.

The Court of Claims found, notwithstanding allegations to the contrary, that the State's employees had not been negligent in failing to prescribe a hearing aid for the infant claimant at an earlier age, because the record contained conflicting expert testimony as to that issue. However, liability was imposed upon the State for having failed to evaluate the claimant as a deaf child in the first instance and for its inordinate delay in re-evaluating his true level of intelligence. The initial error was compounded by the failure to re-evaluate claimant intellectually, particularly in view of the affirmative entries in claimant's records. Notations on the medical records dating back to Donald's admission at Willowbrook in June, 1965 indicate that his hearing was questionable. However, a Kuhlmann intelligence test was administered and a score of 24 recorded on Donald's record. On the basis of such a low intelligence quotient (I.Q.), a decision was made that Donald was not suitable for a trainable and educable program. In May, 1967, however, Donald, then almost five years of age, was enrolled in a speech class. His teacher at the time labeled him as a "very bright" child who would "learn quickly". In August, 1967, Donald was described as an interested youngster who was extremely alert but deaf. Despite these observations inconsistent with his recorded I.Q. of 24, the child was not re-evaluated intellectually until June, 1971. Based upon these circumstances, the trial court made the following finding: "Here the original evaluation of Donald was made without the knowledge that he had a hearing impairment. Accordingly, an improper test was utilized in determining his level of intelligence. Therefore, it is clear that the case is not one involving an exercise of professional medical judgment. The erroneous evaluation was compounded by the fact that no further reevaluation was made. This, despite the many notes and observations of Donald's teachers and a statute that called for reevalua-

tion. Under such circumstances, the Court finds that there was no exercise of medical judgment".

Having determined that the initial evaluation of claimant by the State staff at Willowbrook was improper and that proper procedure dictated that Donald should have been more promptly re-evaluated, the court focused its attention upon whether the State's error constituted medical or educational malpractice. A key factor in the determination was the court's realization that the failure to have re-evaluated this claimant's intelligence level with a reasonable degree of diligence necessitated his remaining institutionalized with severely retarded patients, bereft of the companionship of normal society at a stage of his development when such contact could have been most advantageous. Based upon a trial record replete with allegations of departures from accepted medical practice, the State was found liable for medical malpractice in its evaluation and treatment of Donald Snow. In the language of the court:

"It is clear to the Court that the malpractice, which was committed was not one of educational malpractice, but rather medical malpractice. This finding is substantiated by the very nature of the Willowbrook State School. The patients are under continuous treatment. They receive continuous medical, as well as, psychological treatment.* Even Willowbrook's records, belie the State's assertion that it is merely a school. Without performing a textual exegesis on Claimant's Exhibit '1', it is clear that it is a hospital or medical and not a school record. Also, the payment for Donald's treatment was made under his father's medical plan. Based upon the above, as well as other testimony and documents submitted in evidence, the Court finds that the malpractice committed by the employees of Willowbrook was medical in nature, and hence governed by the law applicable to medical malpractice.

"In general, the law will hold a defendant liable for medical malpractice if that defendant fails to exercise reasonable care and diligence in the treatment of a patient. *Pike* v *Honsinger*, 155 NY 201. Here, Willowbrook failed to exercise reasonable care and diligence in its initial evaluation of Donald. The record is replete with reference to the

ineptitude of the Willowbrook staff and their departure from good medical practice. Even the record from the Suffolk State School evidences this fact. An unsigned memo from Mrs. Steiner, Donald's teacher and Mr. Fineman, a psychologist states:

" 'It is our opinion that Donald Snow is functioning at a level which is well above mental retardation, and he does not belong at Suffolk State School or, for that matter, any other school for the mentally retarded * * * We feel a grave injustice has been dealt to this child as a result of his misplacement several years ago and that, any and all steps should be taken to compensate for those lost years of proper training.' "

---

"* [Former] Section 120 of the Mental Hygiene Law, in enumerating the State institutions for mental defectives also notes their functions in the following language: '[t]here shall be the state schools named below, which are hereby declared to be corporations, for the care, treatment, training and education of the mental defectives of the state' ".

Inasmuch as said malpractice was found to have constituted the proximate cause of claimant's injuries, the court attempted to compute the present and future damages to which claimant was entitled. After a great deal of speculation regarding lost potential earning capacity, the court rendered an award of $2,500,000 as compensation for the lost years of proper training. We are called upon to evaluate the propriety of that determination.

The State's position, in essence, is that claimant is improperly seeking in this claim for medical malpractice and negligence to recover upon the nonactionable theory of educational malpractice (see *Hoffman v Board of Educ.*, 49 NY2d 121; *Donohue v Copiague Union Free School Dist.*, 47 NY2d 440). As per the State's view of the evidence, expert opinion was divided as to the practicality of more frequent re-evaluation of Donald's I.Q. level inasmuch as earlier independent diagnoses had revealed him to be mentally retarded. Moreover, the State maintains that since Donald scored a mere 57 on the Hiskey-Nebraska I.Q. test admin-

istered in 1971, "it defies logic to believe that anything other than a mentally retarded score would have been measured had more testing been done between 1965 and 1971". Thus, the State contends, even if the Willowbrook staff erred in determining the form and extent of treatment best suited to claimant's needs, such error would merely constitute one of professional judgment and hence not be legally cognizable (*Taig v State of New York,* 19 AD2d 182, 183; *St. George v State of New York,* 283 App Div 245, 248, affd 308 NY 681, mot for rearg den 4 NY2d 960).

While it would be inequitable to hold the State liable for honest errors in medical judgment committed by its agents, liability can and should ensue if that judgment was not based upon intelligent reasoning or upon adequate examination so that there has been a failure to exercise any professional judgment (*Pike v Honsinger,* 155 NY 201, 210; *Oelsner v State of New York,* 98 AD2d 714; *Bell v New York City Health & Hosps. Corp.,* 90 AD2d 270, 279; *Pigno v Bunim,* 43 AD2d 718, affd 35 NY2d 841). Although "the line between medical judgment and deviation from good medical practice is not easy to draw" (*Topel v Long Is. Jewish Med. Center,* 55 NY2d 682, 684), the record herein is replete with expert testimony sufficient to establish a claim for medical malpractice against the State. In our view, the trial court's conclusion that this case involves more than a mere error in professional judgment is justified by the record.

According to the testimony of claimant's expert, Dr. Irving Fish, director of pediatric neurology at New York University Medical Center, the initial I.Q. test administered to claimant was unreliable because the Kuhlmann test was not designed for the deaf and because I.Q. tests are extremely crude barometers of intelligence for children of Donald's age at the time of his admission to Willowbrook. It bears noting that the notation "hearing questionable" on Donald's physical examination record made at the time of his admission to Willowbrook did not result from a recognized hearing test. Rather, it was an observation made by the examining physician after Donald had failed to react to a loud clapping of hands behind him. There is no evidence that any further hearing tests were conducted prior to the

I.Q. test. Nor may it be assumed that the State psychologist who tested Donald's I.Q. must have been aware of his potential hearing problem since the examining physician had no independent memory of administering the test and his report did not refresh his recollection of those events.

Moreover, the record reveals Donald to have been observed at Willowbrook as a child who outwardly could not have had an I.Q. of 24 inasmuch as an individual with such limited capacities could not be trained for daily living. According to the testimony of Dr. Jerome D. Schein, the record indicates that during his institutionalization at Willowbrook, claimant was a "bright normal child based on the notes from the teachers of the kinds of things that he was doing". In general, he was responding as a deaf child but was not being treated specifically as a deaf child.

Dr. Manny Sternlicht, who was chief psychologist at Willowbrook at the time of Donald's admission, is on record as stating that staff teachers who noted that Donald was bright and that he did not appear to be retarded, should have requested another evaluation. The State is, of course, liable for such omissions on the part of its staff. As further evidence of departure from accepted practice, there is testimony on record to the effect that it was standard psychological practice at Willowbrook not to re-evaluate patients who had been designated profoundly retarded.

Claimant's witnesses agreed that a re-evaluation of his I.Q. was mandated in order to ascertain whether he had correctly been categorized as an imbecile with the most dismal of prospects for development. The failure to have conducted a re-evaluation with any degree of diligence constituted a departure from accepted medical standards.

■ Courts have consistently refused, based upon considerations of public policy, to entertain lawsuits predicated upon a theory of educational malpractice (*Hoffman v Board of Educ.*, 49 NY2d 121, *supra; Donohue v Copiague Union Free School Dist.*, 47 NY2d 440, *supra; Torres v Little Flower Children's Servs.*, Supreme Ct, New York County, May 10, 1983, PECORA, J., affd 94 AD2d 987, app dsmd 60 NY2d 701; *Paladino v Adelphi Univ.*, 89 AD2d 85; *Pietro v St. Joseph's School*, Supreme Ct, Suffolk County, Sept. 21,

1979, McCARTHY, J. [48 USLW 2229]; *Loughran v Flanders,* 470 F Supp 110 [wherein the court held that such claims, which necessarily hinged upon questions of methodology and educational priorities, were not appropriate for resolution by courts]; *Peter W. v San Francisco Unified School Dist.,* 60 Cal App 3d 814). While the State, in the operation of its psychiatric facilities, should not be held liable for errors of professional judgment, liability will be imposed for acts of medical malpractice on the part of its doctors who fail to diagnose and treat specific conditions of their psychiatric patients (*Masgai v State of New York,* NYLJ, Jan. 17, 1983, p 15, col 2).

We conclude in this case that the mistaken institutionalization which caused the infant claimant severe and permanent psychological damage and irreparably impaired his ability to speak, communicate and read emanated from the use of an improper I.Q. test to assess the child's intellectual capacity. The allegations in *Donohue v Copiague Union Free School Dist. (supra)* are pale in comparison to the reality of Donald Snow's situation. The thrust of the plaintiff's allegations in *Donohue (supra)* was that notwithstanding his acquisition of a high school diploma, he lacked the ability to comprehend written English on a level sufficient to enable him to complete applications for employment. The essence of the plaintiff's complaint was that this deficiency was attributable to the failure of the defendant school district to perform its duties to educate him. The court refused to recognize the claim on the ground that jurisdiction over educational affairs is vested in the Board of Regents and the Commissioner of Education rather than the courts. "To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly, to sit in review of the day-to-day implementation of these policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies. (*James v Board of Educ.,* 42 NY2d [357], at p 367, *supra.*)" (*Donohue v Copiague Union Free School Dist., supra,* pp 444, 445.)

In *Hoffman v Board of Educ.* (*supra*) the Court of Appeals again considered the issue of educational malpractice and precluded recovery for claims based upon that theory. That case is readily distinguishable from the instant situation in several important respects.

Initially we note that there was no evidence that the original evaluation of Daniel Hoffman was conducted improperly. Secondly, the failure to have re-evaluated Daniel Hoffman's intelligence constituted a justifiable exercise of judgment in view of his teacher's daily observations regarding his lack of progress. In marked contrast, the recorded observations of Donald Snow's teachers were sufficient to have impugned the accuracy of the original diagnosis. Moreover, upon discovery of Donald's deafness, the State, having based the initial I.Q. classification upon a test designed for persons who could hear, was required to re-assess the results of that test. The failure to so act constituted a discernible act of medical malpractice on the part of the State rather than a mere error in judgment vis-à-vis claimant's educational progress. Consequently, this appeal does not involve a noncognizable claim for educational malpractice, and the *Hoffman* (*supra*) line of cases is not controlling.

With respect to the matter of damages, we conclude that while the Court of Claims was correct in its finding of liability, the award of $2,500,000 to claimant for all his present and future damages was excessive. The computation of damages in a case of such stunted development is necessarily speculative and fraught with difficulties. Notwithstanding the fact that the years lost due to the State's improper diagnosis, treatment and training of claimant are irretrievable, we are of the view that the exorbitant dollar amount of the award is reflective of the court's sympathy for this unfortunate claimant (cf. *Juiditta v Bethlehem Steel Corp.*, 75 AD2d 126, 138). Accordingly, we order that the award on claimant's behalf be reduced, as an exercise of discretion, to the sum of $1,500,000. As so modified, the judgment under review should be affirmed.

GULOTTA, J. P., O'CONNOR and RUBIN, JJ., concur.

Judgment of the Court of Claims, dated January 19, 1982, modified, on the facts and in the exercise of discre-

tion, by reducing the award to claimant Donald Snow to the principal sum of $1,500,000. As so modified, judgment affirmed, without costs or disbursements, and matter remitted to the Court of Claims for entry of an appropriate amended judgment.