64 N.Y.2d 119 (1984)
Frank Torres, Appellant,
v.
Little Flower Children's Services et al., Respondents.
Court of Appeals of the State of New York.
Argued November 14, 1984.
Decided December 27, 1984.
Marcia Robinson Lowry and Lauren Anderson for appellant.
Martin F. Hayes and J. Russell Clune for Little Flower Children's Services and another, respondents.
Frederick A. O. Schwarz, Jr., Corporation Counsel (Karen Hutson, Ronald E. Sternberg and Pamela Seider Dolgow of counsel), for the City of New York and others, respondents.
Judges JASEN, JONES and SIMONS concur with Judge KAYE; Judge MEYER dissents and votes to reverse in a separate opinion in which Chief Judge COOKE and Judge WACHTLER concur.
*123 KAYE, J.
In Hoffman v Board of Educ. (49 N.Y.2d 121) and Donohue v Copiague Union Free School Dist. (47 N.Y.2d 440), we dismissed complaints for educational malpractice, holding that as a matter of public policy the courts would not second-guess the professional judgments of public school educators and administrators in selecting programs for particular students. In the appeal before us plaintiff, who never learned to read despite a public school education, seeks damages from his legal custodians for his failure to receive an appropriate education. While he urges that there are material differences from Hoffman and Donohue, we conclude that the same policy considerations bar recovery.
In 1964, when plaintiff, Frank Torres, was seven years old, his mother abandoned him and defendant New York City Department of Social Services (DSS) assumed responsibility for his care. DSS placed him with defendant Little Flower Children's Services, an authorized child care agency (Social Services Law, § 371, subd 10), which assumed a contractual obligation to provide him basic care, including room and board, and "the arrangement, as needed, of religious training, education and vocational training." At the time, plaintiff was fluent in Spanish but spoke and understood little English. Little Flower enrolled *124 him in a public school operated by the New York City Board of Education on the agency's premises. Plaintiff admitted that he started to understand English "around the third grade." While he was capable of doing math work at a normal level, he began doing poorly in reading. According to a report submitted by Little Flower to DSS, plaintiff was determined in a 1967 psychological study to suffer from borderline retardation. In light of his perceived condition, teachers at the public school assigned him a lesser work load but for the most part kept him in the regular classes, allowing him to sit in back of the classroom without participating in the instruction. Plaintiff's reading problem was regularly discussed at conferences attended by Little Flower staff members as well as the school principal and teachers. Little Flower felt that the public school was equipped to deal with this type of learning disability and did not attempt to provide supplemental reading instruction, except for a short period after seventh grade when plaintiff attended a special class.
In March 1972, a Little Flower social worker took plaintiff to a reading specialist who administered a series of tests with a view toward establishing an education plan to be initiated after plaintiff's graduation from eighth grade in June 1972. The reading specialist concluded that plaintiff was not retarded but suffered from an "extremely complex reading disability." He said, "To outline a remedial approach for Frank would be synonymous with writing a textbook." However, he did recommend a method which had been described in detail in a designated publication.
Following the testing, plaintiff was tutored through the use of reading machines but he graduated from the eighth grade unable to read. The method recommended by the reading specialist was never implemented. However, Little Flower did arrange for further tutoring upon plaintiff's graduation from grammar school. After some months, plaintiff stopped attending the tutoring sessions because no transportation was provided and the walk took approximately 45 minutes each way. In October 1972, plaintiff was enrolled in a BOCES school and placed in a class for the educable retarded, but he was expelled after various difficulties in March 1973. Little Flower discharged plaintiff from its care in 1976.
Alleging that he was functionally illiterate, plaintiff brought this action against DSS, Little Flower, several individuals associated with them, and the Board of Education and school principal (the last two since dropped from the suit). He charged that defendants were negligent and violated the contract between *125 DSS and Little Flower in failing to provide him with an appropriate education, and asserted a cause of action based on 42 USC § 1983 because he was not afforded a hearing with respect to the deprivation of an appropriate education. On defendants' motions for summary judgment, Special Term dismissed the complaint, characterizing the negligence claim as educational malpractice and finding the contractual duties met by the placement of plaintiff in a public school. The court did not address the constitutional claim. The Appellate Division affirmed, without opinion, and this court granted leave to appeal. We now affirm.
In Donohue v Copiague Union Free School Dist. (47 N.Y.2d 440, supra), plaintiff brought an action against the school district because he was graduated from high school unable to comprehend written English. He alleged that the school failed to evaluate his mental ability or take adequate remedial measures to deal with his learning disability. The court assumed that a tort action for educational malpractice could be stated, but nonetheless held as a matter of public policy that courts should not entertain such claims because to do so "would require the courts not merely to make judgments as to the validity of broad educational policies  a course we have unalteringly eschewed in the past  but, more importantly, to sit in review of the day-to-day implementation of these policies." (Id., at p 445.) In Hoffman v Board of Educ. (49 N.Y.2d 121, supra), plaintiff was mistakenly diagnosed as retarded by a psychologist whose recommendation for retesting was ignored. As a result, plaintiff, a person of normal intelligence, was educated in a class for children with retarded mental development. The court found the negligence cause of action grounded in educational malpractice and therefore barred by Donohue, stating "the courts of this State may not substitute their judgment, or the judgment of a jury, for the professional judgment of educators and government officials actually engaged in the complex and often delicate process of educating the many thousands of children in our schools" (id., at pp 125-126). As we noted, "the court system is not the proper forum to test the validity of the educational decision to place a particular student in one of the many educational programs offered by the schools of this State" (id., at p 127).
Plaintiff advances several arguments in an effort to distinguish Hoffman and Donohue. First, he asserts that those decisions prevented only suits against educators whereas here the charges are asserted against those responsible for his upbringing. Second, drawing an analogy to Klostermann v Cuomo (61 N.Y.2d 525), he argues that he is not asking the court to evaluate *126 different educational approaches but rather to enforce duties imposed on defendants principally by statute and common law. Those arising from statute  the Social Services Law and the Education Law  in general (1) require DSS to care for abandoned children and supervise child care agencies, which in turn must arrange for appropriate education, and (2) allow DSS or the agency to obtain administrative review of decisions made by the school regarding a variety of programs available to needy children.[1] The common-law duties, it is argued, stem from DSS's parens patriae function and from Little Flower's responsibility for plaintiff's daily care. A third distinction offered is that defendants breached their contract, which obligated Little Flower to provide education "as needed," to comply with the Social Services Law, and to submit to DSS a detailed service plan concerning plaintiff's care. The contract also required DSS to supervise plaintiff's treatment. Finally, plaintiff asserts a deprivation of due process of law.
We cannot accept plaintiff's initial argument that even if an action grounded in educational malpractice may be barred by public policy considerations when brought against the school, a different result should obtain when this same claim is lodged against the child's legal custodians. What is at the root of the policy enunciated in Hoffman and Donohue is not the identity of the defendant but the nature of the determinations courts would be called upon to make. This policy is equally applicable whether the student challenges educational decisions made by the Board of Education or by his guardians in response to actions taken by school officials, for in either situation the court would be thrust into the position of reviewing the wisdom of educators' choices and evaluations. Here, for example, plaintiff's allegations would require the courts to assess the nature of his difficulty in learning, including such elusive factors as his own attitude, motivation, temperament, past experience and home environment (see Donohue v Copiague Union Free School Dist., 47 N.Y.2d 440, 446 [Wachtler, J., concurring], supra), to examine Board of Education policies and their implementation by school *127 officials  the very role we have already declined to assume  and then in addition to determine whether the guardians' responses to these policies and decisions constituted negligence.[2] While we have noted the right of students and parents to question choices made by educators (id., at p 445; Hoffman v Board of Educ., 49 N.Y.2d 121, 127, supra), we did not imply that the exercise of such a right would give rise to damage suits for negligence.
Plaintiff's reliance on Klostermann v Cuomo (61 N.Y.2d 525, supra) is misplaced. There, we held that courts would entertain mandamus proceedings and declaratory judgment actions brought to compel administrative agencies to carry out clearly defined, ministerial acts mandated by the Legislature  furnishing written service plans  even where in determining how to act  i.e., the content of those plans  agencies may have unreviewable discretion. Plaintiff points to no clearly defined, ministerial act mandated by the Legislature which defendants failed to perform. The statutes here require DSS and Little Flower to provide for a suitable or appropriate education and allow them to challenge the school's decisions regarding the programs in which the student is enrolled. Contrary to plaintiff's claim, defendants did act pursuant to their duty to provide for plaintiff's education by placing him in a public school maintained by the Board of Education. What is challenged by plaintiff, but not subject to review, is the agency discretion in the manner in which the statutory duty was fulfilled.[3]
Nor are more specific duties imposed by the government's parens patriae function to safeguard the best interests of children placed in its care, or Little Flower's responsibility to *128 exercise reasonable care for their protection. Social service agencies or foster parents have been found liable in instances where abandoned children placed in foster care have been physically injured due to abuse or neglect (see, e.g., Bartels v County of Westchester, 76 AD2d 517; Andrews v County of Otsego, 112 Misc 2d 37), but liability has not been extended to judgments concerning a child's education. On this question, defendants urge that the only duty of those in a parental relation is to cause the child to "attend upon instruction" (Education Law, § 3212, subd 2, par b). We need not define the responsibility of a legal custodian with respect to a child's education, however, for we assume, as we did in Donohue, that under traditional tort law concepts defendants could be held answerable for their failure to assure plaintiff an appropriate education. Even accepting plaintiff's argument that defendants have such a responsibility, still his claim must fail because of the public policy against educational malpractice claims. Whatever the precise statutory and common-law duties of a child's governmental guardians may be, they do not support an action stemming from the alleged malpractice of public school educators and administrators because such an action is not cognizable in our courts.
For the same reason, plaintiff's cause of action based on contract must also fail; enforcement of the contract as requested would require the court to decide which educational programs might have been preferable. That the source of such a duty was imposed by contract, rather than common law or statute, could not overcome the policy objections to the courts' involvement in these matters (Paladino v Adelphi Univ., 89 AD2d 85). A different question would be posed if the contract required specified services, for instance, a designated number of hours of instruction (id., at p 92).
Finally, plaintiff cannot succeed on his constitutional claim that he was deprived of his State-created entitlement to an "appropriate" education without a hearing. Plaintiff does not complain that he was deprived of any particular program he was then enjoying (see Board of Regents v Roth, 408 US 564; compare Goss v Lopez, 419 US 565). Further, the "entitlement" at issue cannot be determined through the application of objective criteria. Rather, it depends upon the decisions of professional educators as to the needs of a particular student. Such nebulous entitlements do not lend themselves to protection through the procedural due process requirement. Indeed, they do not even come into existence until the discretionary determination as to what is appropriate is made. Though a due process protection *129 may well apply when the child is not placed in school at all (see Patton v Dumpson, 425 F Supp 621, 625), no such claim may be advanced here. (See, also, Donohue v Copiague Union Free School Dist., 47 N.Y.2d 440, 443, supra.)
Plaintiff acknowledges that recovery is precluded against the Board of Education, the party charged with actually furnishing his public school education and thus primarily at fault if he indeed received a deficient education. For the reasons set forth in Hoffman and Donohue recovery for this same alleged injury cannot be permitted against plaintiff's legal custodians. The order of the Appellate Division dismissing the complaint should therefore be affirmed.
MEYER, J. (dissenting).
Because I cannot accept the distinctions drawn by the majority between this case and Klostermann v Cuomo (61 N.Y.2d 525) and Snow v State of New York (64 N.Y.2d 745), I respectfully dissent.
Klostermann v Cuomo (61 NY2d, at p 531, supra) held that "if a statutory directive is mandatory, not precatory, it is within the courts' competence to ascertain whether an administrative agency has satisfied the duty that has been imposed on it by the Legislature" and that plaintiffs in that case had (at p 541) "properly petitioned the courts for a declaration of their rights, whether derived from the Federal or State Constitutions, statutes, or regulations." Plaintiff Torres seeks damages from the city and its employees,[1] and from Little Flower Children's Services, the child-care institution with which the city contracted, for failure of the city to satisfy duties imposed upon it by statute and regulations, and for failure of defendant Little Flower to satisfy the duties imposed upon it by statute and regulation as well as by its contract with the municipality. The majority, because the dereliction from duty has resulted in plaintiff's illiteracy, an educational lack, concludes that the policy against involving courts in the selection of educational programs enunciated in Hoffman v Board of Educ. (49 N.Y.2d 121) and Donohue v Copiague Union Free School Dist. (47 N.Y.2d 440) forecloses plaintiff's claim.
Educational policy is no more involved in Frank Torres' illiteracy than it was in Donald Snow's stunted intellectual growth. In Snow's case those in charge of his custody breached their duty by failing to ascertain that he was totally deaf; in Torres', what defendants failed to ascertain, though obliged to do so, was that he had no understanding of, or ability to speak in, any language *130 but Spanish while he was being raised in an almost entirely English speaking environment. In Snow's case the action has been held maintainable because predicated on medical, rather than educational, malpractice; in like manner Torres' claim should be held maintainable because based on custodial, rather than educational, breach of duty.
Special Term did not discuss the duties of the city at all and as to Little Flower said only that, "The contract required for the arrangement for education, and plaintiff admits he was placed in a public school. As such defendant did not breach its contractual obligation." The Appellate Division affirmed, without opinion.
Summary judgment may not be granted if there is a triable issue of fact and in determining whether there is the evidence presented must be viewed in the light most favorable to the party moved against (Siegel, NY Prac, § 281, p 338). On that basis, there is ample proof, when measured against the obligations of the municipal defendants under statute and regulation, and of defendant Little Flower, under statute, regulation and contract of which plaintiff was the third-party beneficiary, to require denial of defendants' motions.
As we have made clear in Tucker v Toia (43 N.Y.2d 1) and Matter of Lee v Smith (43 N.Y.2d 453), section 1 of article XVII of the State Constitution imposes upon the State an affirmative duty to aid the needy, which clothes the Legislature with discretion to determine the means by which aid is to be provided, but "unequivocally prevents the Legislature from simply refusing to aid those whom it has classified as needy" (Tucker v Toia, 43 NY2d, at p 8, supra). What distinguishes this case from the Hoffman and Donohue cases is that we deal here with whether the agencies chosen to carry out the State's obligation to a needy foster child have carried out the duties imposed upon them by the Legislature and the governmental agencies acting under its aegis, not with whether the educational institution itself followed its separate, though incidentally related, obligations. And what distinguishes the obligation of defendants in this case from those of natural parents and other persons in parental relation to a child is that, although section 3212 (subd 2, par b) of the Education Law imposes upon both the duty to "cause such individual to attend upon instruction", the Social Services Law imposes upon defendants obligations not imposed upon natural parents by that or any other statute, or (if, for purposes of argument we accept a broad view of the parental immunity *131 declared in Holodook v Spencer, 36 N.Y.2d 35)[2] by common law. The overly simplistic view of Special Term, apparently accepted by the Appellate Division, that defendants had discharged their full obligation to Frank Torres by causing him to attend the public school maintained by the City Board of Education on Little Flowers' premises fails to consider the pertinent constitutional, statutory, regulatory and contractual provisions.
Section 398 of the Social Services Law provides that the city's public welfare officers "shall have powers and perform duties" including with respect to defective children to "[o]btain admission to state or other suitable schools, hospitals, other institutions * * * in accordance with the provisions of the mental hygiene law, education law and acts relating to the family court" (subd 4, par [a]) and with respect to all children within their care to "[p]rovide for expert mental and physical examination of any child whom he [sic] has reason to suspect of mental or physical defect or disease" (subd 6, par [b]) and to "provide suitable vocational training" (subd 6, par [k]).
Section 395 of the Social Services Law permits the public official charged with those duties to administer them either directly or through an authorized agency, but the institution in which a child is placed must be conducted in accordance with applicable regulations and the placement is to be supervised by the public official (Social Services Law, § 398, subd 6, par [g]). As the supervision requirement indicates, administration through an agency or institution such as Little Flower does not relieve the public official of his or her statutory obligations. Those obligations are nondelegable (Bartels v County of Westchester, 76 AD2d 517, 523) as was indeed recognized in the preamble to section VII and in section X (par A) of the contract between the city and Little Flower.
The regulations adopted pursuant to that authority required not only that children in the care of the institution receive suitable education as required by law (18 NYCRR 5.19 [in effect at times pertinent to this case], now 18 NYCRR 441.13) but also that a plan of service be developed for such child (18 NYCRR 5.22, now 18 NYCRR 441.14 [b]) and that psychiatric and psychological services, including tests and examinations, be made available to children under care of the institution (18 NYCRR 5.20 [b], now 18 NYCRR 441.15). Moreover, as to the plan of service, the State Board's Commentary to section 5.22 not only required a preliminary plan on intake which was to *132 include "proper placement in school" and "special services needed, e.g., remedial reading, speech therapy", but also required that the plan of service "be subject to constant evaluation and formally reviewed annually," and the Commentary to section 5.20 (b) recommended appropriate use of psychological services, including direction of a remedial program.
Little Flower does not dispute that it is an authorized agency governed by the above provision and that its contract with the municipal defendants required it to arrange, "as needed, religious training, education and vocational training." Its argument that its obligation is limited solely to such arrangement overlooks the facts that (1) the quoted words simply define the "Basic Care" to be provided under the contract, (2) the contract required it to provide foster care services, (3) under section III of the contract it agreed to provide those services "in accordance with the Social Services Law, Rules of the State Board of Social Welfare, the Regulations of the New York State Department of Social Services, the Inter-Agency Manual and the policies and procedures of the Department" and (4) section VII of the contract required that it provide an initial service plan within 60 days of the placement of a child, submit a semiannual review at the end of six months and obtain reauthorization of the placement annually.
As one of the foster care children for whose benefit the contract with Little Flower was made, Frank Torres would be entitled, as a third-party beneficiary, to recover for its breach (see Seaver v Ransom, 224 N.Y. 233).[3] And as Snow v State of New York (supra), makes clear, the negligent failure of defendants, including Little Flower, to carry out the obligations imposed by statute or regulation may give rise to liability (see, also, Doe v New York City Dept. of Social Servs., 649 F.2d 134, on second app 709 F.2d 782, cert den ___ US ___, 104 S Ct 195).
Considered in light of the foregoing, the record, without question, presents triable issues of fact. The claim simply is that the defendants were aware of Frank Torres' language problem but did nothing at all to remedy it. Thus it was known to defendants when he entered Little Flower that he spoke only Spanish, and an entry in his case record made a year later noted that, "Because of a language problem, communication with Frank has been minimal. He does not appear to understand the drift of a question and his answers are confused and inappropriate." Yet no steps were taken by defendants to assist him in overcoming *133 his language problem. The Learning Diagnostic Center later noted that Frank's "early attempts to learn to read and write were therefore surrounded by anxiety and confusion, due to his struggle with English." Instead, based on tests administered in English, he was placed in classes for the retarded, and this despite the fact that his achievements in mathematics were inconsistent with retardation. Then when finally referred to a reading specialist, who recommended specific steps to remedy plaintiff's reading problem, nothing was done during the ensuing four years that plaintiff remained in defendant's custody. And of all this the city defendants received regular reports.
Donald Snow was misdiagnosed as retarded and will recover $1,500,000 because Willowbrook's care included medical and psychiatric services and its failure can be labeled medical, rather than educational, malpractice. Yet Frank Torres, also misdiagnosed as retarded by those who had charge of his custody and were obligated to obtain for him instruction, including the ability to read and write in English, necessary reasonably to prepare him for later life, receives nothing because the issue is said to involve educational policy. If a label is necessary, defendants' failures can properly be designated custodial malpractice. But in truth what is here involved, so the trier of fact could find, is a simple failure to carry out obligations imposed by Constitution, statute, regulation and contract, which has resulted in plaintiff's illiteracy, but is wholly distinct from matters of educational policy.
Order affirmed, with costs.
NOTES
[1] For example, DSS has the duty to care for abandoned children (Social Services Law, § 398, subd 2, par [b]), to provide suitable vocational training in certain circumstances (Social Services Law, § 398, subd 6, par [k]) and to supervise the institution in which the child is placed (Social Services Law, § 398, subd 6, par [g]). The child care agency must arrange for the child to receive a suitable education (18 NYCRR 441.13 [formerly 5.19]). Either organization may seek administrative review of any decision made by school officials (Education Law, § 310), including those with respect to special services available for handicapped children (current version codified at Education Law, § 4402).
[2] Contrast Snow v State of New York (64 N.Y.2d 745). In Snow, plaintiff was under three years of age when he was admitted to the Willowbrook State School, an institution where the "patients" received continuous medical and psychological treatment, where plaintiff's record resembled a hospital or medical record rather than a school report, and where payment for treatment was made under his father's medical plan. Plaintiff was deaf, but his condition was not diagnosed. Instead, he was given an intelligence test inappropriate for deaf children, resulting in his mistaken institutionalization and consequent injury. The Appellate Division upheld plaintiff's cause of action as grounded in medical, rather than educational, malpractice. While mistaken evaluations are central to both Snow and Torres, such factors as age of the child upon entry, nature of the institution and kind of care administered mark the difference between medical and educational malpractice claims.
[3] The dissent points to the various obligations the law imposes on defendants to determine a child's special needs (dissenting opn, at pp 131-132). Plaintiff's underlying contention is not that defendants ignored any specific statutory direction to conduct reviews, for the record indicates that they conferred periodically about plaintiff's problem, but that they erroneously concluded that the public school was equipped to deal with him.
[1] For convenience, hereafter referred to collectively as the city.
[2] See Bartels v County of Westchester (76 AD2d 517, 522) and Andrews v County of Otsego (112 Misc 2d 37, 44).
[3] How damages for the breach would be calculated need not be considered on this motion for summary judgment (CPLR 3212, subd [b]).