**Arnold RICH, Guardian and Next Friend for John RICH and John Rich, Appellants,**

v.

**KENTUCKY COUNTRY DAY, INC., Appellee.**

**No. 89–CA–899–MR.**

Court of Appeals of Kentucky.

March 30, 1990.

Discretionary Review Denied by Supreme Court Sept. 19, 1990.

J. Andrew White, Louisville, for appellants.

Frank P. Doheny, Jr., Jessica R. Schumacher, Woodward, Hobson & Fultom, Louisville, Robert L. Chenoweth, Bryan, Fogle & Chenoweth, Frankfort, Edward H. Stopher, Donald K. Brown, Jr., William P. Swain, Boehl, Stopher, Graves & Deindoerfer, Louisville, for appellee.

Before EMBERTON, LESTER and MILLER, JJ.

LESTER, Judge.

This is an appeal from a summary judgment, supported by an opinion, dismissing appellants' complaint alleging educational malpractice based in tort and contract together with slander and defamation.

Between the briefs for both parties, we note some nineteen pages devoted to a recitation of the facts which the trial court summarized in a manner more than adequate to address the initial issue. We quote:

John [Rich] was first enrolled in Country Day in the second grade in 1978. In order to continue successive yearly enrollments, it is necessary for a student to maintain a required scholastic standing, basically a C average. John continued attendance at Country Day through Grade 8 (1984–85) without apparent re-enrollment problems. In Grade 9 (1985–86), early on, because of low grades, failure to complete assignments and to turn in required homework, he was cautioned that if this continued, he may not be eligible for enrollment in Grade 10 (second year of High School). His grades did not improve. After considerable effort on Mr. Rich's part to secure John's enrollment in Grade 10, the parties came to an understanding that if John would attain certain scholastic requirements in a summer school, his application for enrollment would be reconsidered. John attended Culver Military Academy during the summer, accomplished the scholastic requirements, and Country Day accepted his enrollment in Grade 10 (1986–87) *on probation.* During this sophomore year, John again failed to complete assignments, turn in required homework, and to maintain the required C average. As a result, Country Day refused his application for acceptance in Grade 11 (third year of high school).

In January, 1986 (during Grade 9), Mr. Rich had John examined by a distinguished school and child psychologist, Dr. Louis Earl Epstein, who had examined and treated John prior from 1980 to 1982 for problems arising out of his parents' divorce. In March, 1986, Dr. Epstein diagnosed John as having a mild form of *Attention Deficit Disorder,* which he states causes one to have problems with organization, sustaining attention, completing assignments on time, and taking certain types of written examinations. It is his opinion that this psy-

chological disorder is an underlying factor in John's scholastic failures.

The Director of the Upper School (high school principal), and John's teachers disagree. Their opinion is that John's scholastic failures, including his failure to turn in the required homework, resulted from laziness and his indulgence in social activities. They feel that he is a bright and intelligent youngster and could have met all of the school's academic requirements had he properly applied himself.

In their response Brief, plaintiffs specify their claims for breach of contract and educational malpractice (excluding slander), as follows:

1. "The plaintiff, Arnold Rich, seeks damages against Kentucky Country Day School, Inc., for violation of its contractual duty to provide educational expertise and for malfeasance in the performance of said contract."

2. "The plaintiff, John Rich, seeks damages against Kentucky Country Day School, Inc., for their negligent conduct and failure to recognize his learning disability and failure to properly deal with same after it was diagnosed and disclosed to school officials."

It is the opinion of this Court that the plaintiffs' offered evidence fails to show a breach of contract by Country Day. The evidence of plaintiffs is clear that they understood that each enrollment contract was for one year; and that in order to secure an enrollment contract in the succeeding year, John had to maintain a C average. This is not an unreasonable requirement. While Country Day would have been contractually able to have refused John's admittance to the sophomore year, it nevertheless, upon the persistence of his father, permitted his probational enrollment. At that time, Mr. Rich knew John's psychological disability as believed by Dr. Epstein, he knew the enrollment was probationary, and yet he persisted in John's enrollment. When John again failed to meet the academic requirements in Grade 10, the school was acting within its contractual rights in refusing to accept John in the Junior year. There is no evidence that Country Day was not offering its students a quality education. There is no provision in any of the annual contracts, the school's brochures, or in any of the conversation between the parties, under which the school contracted to diagnose psychological disorders in its students, or to provide a special course of studies to any student suffering from such a malady. A party to a contract cannot breach the contract by failing to do something that the contract does not require him to do.

Intertwined with the claim for breach of contract (and apparently resting on the same factual basis) both plaintiffs are claiming that Country Day, was negligent in failing to diagnose John's alleged psychological deficit, and in negligently failing to provide him with a personalized educational program adopted to that condition.

In order for the plaintiffs to maintain an action for negligence against the defendant, plaintiffs must establish that Country Day had a *duty* to perform, that it failed to perform the duty, and that as a direct result of such failure the plaintiffs were injured. This latter requirement is referred to as causation. Absence of any one of these three elements is fatal to the claim. *M. & T. Chemicals, Inc., v. Westrick, Ky., 525 SW(2) 740 (1974).* In professional malpractice actions, the duty is usually and customarily established by evidence of acceptable standards of care peculiar to the profession, and the law permits the professions to establish the standards.

The trial court was called upon to give life to a new theory best termed educational malpractice which it immediately recognized and made response. We find no reason to attempt to improve upon the opinion of Judge Higgins, so we adopt his views as our own when he wrote:

The issue of educational malpractice is one of first impression in Kentucky. Claims for educational malpractice have been considered and rejected in five states; California, New York, Alaska, Florida, and Maryland. See *Peter W. v.*

*San Francisco Unified School District, App.*, [60 Cal.App.3d 814] 131 Cal.Rptr. 854 (1976). *Donohue v. Copiague Union Free School District*, 47 N.U.[N. Y.]2d 440, 418 N.W.S.[N.Y.S.]2d 375, 391 N.E.2d 1352 (1979). *Helm v. Professional Children's School*, 103 Misc.2d 1053, 431 N.Y.S.2d 246 (Sup.1980); *DSW v. Fairbanks No. Star Bor. Sch. Dist.*, 628 P.2d 554 (Alaska 1981); *Tubell v. Dade County Public School*, 419 So.2d 388, 389 (Fla.Dist.Ct.App.1982); *Hunter v. Board of Education of Montgomery County*, 292 Mf.[Md.] 481, 439 A.2d 582 (1982); and *John Doe v. Board of Education of Montgomery County*, 295 Mf.[Md.] 67, 453 A.2d 814 (1982). In *B.M. v. State*, Mont. 649 P.2d 425 (1982), Montana recognized the tort of educational malpractice where a school allegedly failed to comply with a statutory requirement. Here, there is no claim Country Day failed to comply with a statute.

The many problems inherent in the theory of educational malpractice were clearly set forth in *Peter W.*, supra, as follows:

"On occasions when the Supreme Court has opened or sanctioned new areas of tort liability, it has noted that the wrongs and injuries involved were both comprehensible and assessable within the existing judicial framework. (citation deleted) This is simply not true of wrongful conduct and injuries allegedly involved in educational malfeasance. Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might—and commonly does—have his own emphatic views on the subject. The 'injury' claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental, they may be present but not perceived, recognized but not identified.

"We find in this situation no conceivable 'workability of a rule of care' against which defendants' alleged conduct may be measured (citation deleted), no reasonable 'degree of certainty that ... plaintiff suffered injury' within the meaning of the law of negligence, (citation deleted) and no such perceptible 'connection between the defendant's conduct and the injury suffered,' as alleged, which would establish a causal link between them with the same meaning. (citation deleted)

"These recognized policy considerations alone negate an actionable 'duty of care' in persons and agencies who administer the academic phases of the public education process. Others, which are even more important in practical terms, command the same result. Few of our institutions, if any, have aroused the controversies, or incurred the public dissatisfaction, which have attended the operation of the public schools during the last few decades. Rightly or wrongly, but widely, they are charged with outright failure in the achievement of their educational objectives; according to some critics, they bear responsibility for many of the social and moral problems of our society at large. Their public plight in these respects is attested in the daily media, in bitter governing board elections, in wholesale rejections of school bond proposals, and in survey upon survey. To hold them to an actionable 'duty of care,' in the discharge of their academic functions, would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers. They are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared. (citation de-

leted) The ultimate consequences, in terms of public time and money, would burden them—and society—beyond calculation.

"Upon consideration of the role imposed upon the public schools by law and the limitations imposed upon them by their publicly-supported budgets (citation deleted) and of just-cited 'consequences to the community of imposing [upon them] a duty to exercise care with resulting liability for breach' (citation deleted) we find no such 'duty' in the first count of plaintiff's complaint. As this conclusion is dispositive, other problems presented by the pleading need not be discussed: it states no cause of action." (citation deleted)

In *Helm*, supra, New York also applied the foregoing principles to private schools, and in addition to the limitless problems in attempting to establish educational standards of care, in a concurring opinion, discusses the impossibility of establishing *causation*, as follows:

"The practical problems raised by a cause of action sounding in educational malpractice are so formidable that ... such a legal theory should not be cognizable in our courts. These problems clearly articulated at the Appellate Division, include the practical impossibility of proving that the alleged malpractice of the teacher proximately causes the learning deficiency of the plaintiff student. *Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning.*" (emphasis added)

The basic justifications set forth in the aforesaid cases for refusing to recognize an action for educational malpractice have been capsulized by defendant's counsel as follows:

(1) lack of a satisfactory standard of care by which to measure an educator's conduct; (2) inherent uncertainty in determining the cause and nature of any damages; (3) the resulting burden that would be placed on schools in what reasonably may be predicted to be an ensuing flood of litigation; and (4) that such a cause of action would force the courts blatantly to interfere with the internal operations and daily workings of an educational instruction.

This Court agrees with the logic and legal reasoning set forth above.

In addition to the authorities cited above, we direct the attention of interested parties to *Hoffman v. Board of Education of City of New York*, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979) (interference with a school system); *Carroll v. Lucas*, 39 Ohio Misc. 5, 313 N.E.2d 864 (1974) (assigned book with sexual material); and *Aubrey v. School District of Philadelphia*, 63 Pa.Cmwlth. 330, 437 A.2d 1306 (1981) (sex education curriculum).

The trial court's conclusion is supported by the renowned Professor W. Page Keeton, editor of Prosser and Keeton, *Torts* § 131 at 1048 (5th ed. 1984) wherein it was pointed out that:

... the "educational malpractice" claims, based on a school's failure to teach, test or counsel a pupil adequately, with resulting emotional or intellectual harm, have been denied for reasons sometimes similar to those involved in the discretionary immunity.

We cannot overlook the language of *Donohue v. Copiague Union Free School District, supra*, to the effect:

To entertain a cause of action for "educational malpractice" would require the courts not merely to make judgments as to the validity of broad educational policies—a course we have unalteringly eschewed in the past—but, more importantly, to sit in review of the day-to-day implementation of these policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies. (*James v. Board of Educ.*, 42 N.Y.2d [357], at p. 367, 397 N.Y.S.2d [934] at p. 942, 366 N.E.2d [1291] at p. 1298 [1977], *supra*.) Of course, "[t]his is not to say that there may never be gross violations of defined

public policy which the courts would be obliged to recognize and correct." (*Matter of New York City School Bds. Assn. v. Board of Educ.*, 39 N.Y.2d [111] at p. 121, 383 N.Y.S.2d [208] at p. 214, 347 N.E.2d [568] at p. 574 [1976], *supra.*)

*Donohue* involved a public school system but a year (1980) after that decision, the principles announced therein were extended to the private institutions in *Helm, supra,* when the New York Supreme Court said:

> However, as observed by Judge Wachtler in his concurring opinion in *Donohue, supra,* 47 N.Y.2d at page 445, 418 N.Y. S.2d at page 379, 391 N.E.2d at page 1356:
>
> We find these considerations to be equally applicable to any attempt to assess the educational experience, whether in the context of public or private education.

It is noteworthy that, with one exception, all the courts, even the "progressively thinking" ones such as California and New York, that have had the issue presented to them have rejected the concept of educational malpractice. The exception, Montana (*B.M. v. State, supra* ), was faced with a statutory enactment. Our research leads to two conclusions, the first being of the correctness of the cases reviewed and the second is that the fact parents may pay tuition either privately or through taxes gives them no right to dictate to the educational system under threat of an action at law.

▮▮▮ Appellants' complaint alleged a cause of action against the appellee for defamation couched upon the theory of agency. Again, finding no reason for improvement upon the opinion of the trial judge, we adopt his factual determinations and legal conclusions as our own, to wit:

> In addition to plaintiffs' claim for educational malpractice, the plaintiff, John Rich, in Paragraph 12 of the Complaint alleges "agents for the defendant publicly ridiculed, defamed, and otherwise caused a loss of reputation to accrue to plaintiff, John Rich, which loss of reputation was directly attributable to misconduct of defendant's agents."

In support of this claim the plaintiff, John Rich, by deposition, states that some teachers at Country Day on several occasions told him "John, your problem is that you're lazy, you're not doing the work. That's what your problem is." He states that when these statements were made only he and the teacher were present. He states that if other students were apprised of this, it was because he had told them what the teacher had said to him. He testified that the teacher would write on his grade reports that went to his father that he was lazy. On one occasion, a teacher, in the presence of other students, said "Why don't you go back to Culver?" This referred to Culver Military Academy, a school as distinguished as Country Day. John also testified: "There was an incident with a former girlfriend of mine when it was reported to her father by the Headmaster that we were caught making out in a car in front of classes, which never happened." When asked if he had told his friends about this, he answered: "Since the accusation was made, I suppose I have."

There is no claim by plaintiffs that the alleged defamatory statements are slanderous per se. In his Response, counsel states that plaintiffs have "plead a classic case of *slander per quod....* "

In a defamation action based upon slander per quod, as here, the plaintiff must in his Complaint, allege specific damages resulting from the statements made, other than just mental pain, humiliation, disgrace or mortification. If plaintiff fails to allege facts which would show specific damages, and plaintiff's prayer is for general damages only, the Complaint does not state a cause of action for slander per quod. *Elkins v. Roberts, Ky., 242 SW(2) 994 (1951).*

In this action, the plaintiff, John Rich, alleges only that he "has experienced emotional distress, humiliation, and stigmatization." He has alleged no facts which would show damages. In his prayer, he seeks general damages only. He does not allege special damages.

In the case of *Columbia Sussex Corporation, Inc. v. Hay, Ky., App., 627 SW(2) 270 (1981),* this rule of law was stated very clearly:

"Defamation damages are categorized into compensatory (general and special) and punitive. Special damages are those beyond mere embarrassment which support actual economic loss; general damages relate to humiliation, mental anguish, etc.

The major remedial distinction between slander and slander *per se* is that with simple slander there must be showing of special damages in order to establish the element of injury to reputation."

The plaintiff's claim for slander per quod is further faulted. The statements attributed to the teachers that John's problem was that he was lazy or irresponsible are statements of pure opinion. Also, under the facts of this case, if a teacher is describing to his pupil what his school problem is, or writes a comment on the pupil's report card for his parents' benefit and guidance, or discusses with the parents of a female student her conduct with a male student, the statements are qualifiedly privileged. This rule of law is set forth in *53 C.J.S. Libel and Slander, 9(b),* as follows:

"Communications made bona fide on subject matter in which the person communicating has an interest or with respect to which he has a duty, if made to a person having a corresponding interest or duty, are qualifiedly privileged. The duty need not be strictly legal, but it may be one of doubtful or imperfect obligation."

Furthermore, the statements have not been published within the meaning of the law of slander or libel.

As to the final argument concerning appellants' being given inadequate time to conduct discovery, we observe that some thirteen months expired between the filing of the complaint and the entry of judgment. In the first place, the time lapse should have been ample to complete discovery; in the second place leave was granted following motion for summary judgment for appellants to take additional proof; and lastly, appellants never sought more time or complained of the lack thereof to the trial court.

The judgment is affirmed.

All concur.