656 So.2d 906 (1995)
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Petitioner,
v.
B.J.M., Respondent.
No. 83067.
Supreme Court of Florida.
April 27, 1995.
Rehearing Denied July 5, 1995.
*908 Kimberly Tucker, Gen. Counsel and Charles T. Collette, Asst. Gen. Counsel, Office of HRS, Tallahassee, Helen Ann Hauser of Dittmar & Hauser, Coconut Grove, and Morton Laitner, HRS Dist. XI Legal Counsel, Miami, for petitioner.
Christina A. Zawisza, Children First Project, Legal Services of Greater Miami, Inc., and Roy D. Wasson, Miami, for respondent.
Robert A. Butterworth, Atty. Gen., and Wendy S. Morris, Asst. Atty. Gen., Tallahassee, amicus curiae for the State.
ANSTEAD, Justice.
We have for review the following question certified by the Third District Court of Appeal to be of great public importance:
WHETHER AN ADJUDICATED DEPENDENT JUVENILE MAY MAINTAIN AN ORDINARY NEGLIGENCE CLAIM AGAINST THE DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES FOR THE LATTER'S ALLEGED FAILURE TO PROVIDE THE JUVENILE WITH SERVICES?
B.J.M. v. Department of Health & Rehabilitative Services, 627 So.2d 512, 519 n. 6 (Fla. 3d DCA 1993). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. For the reasons expressed below, we answer the certified question in the negative.

CIRCUIT AND DISTRICT COURT PROCEEDINGS
In December 1990, B.J.M., an adjudicated dependent and delinquent minor, by and through Legal Services of Greater Miami, filed a mandamus action against the Florida Department of Health and Rehabilitative Services (HRS) seeking to compel HRS to place B.J.M. in a specific rehabilitative program. Subsequently, B.J.M. amended his complaint to include a tort action for general damages based on negligence. B.J.M. claimed general damages for the effect that the agency's neglect had on his quality of life. The tort count alleged that HRS had negligently breached a duty to B.J.M. in the following ways: not following recommended psychiatric placement reports; failing to provide proper counseling; failing to provide vocational training or educational services comparable to those provided in nonresidential settings; failing to generally meet B.J.M.'s placement, emotional, and developmental needs; and by the inappropriate labeling of B.J.M.
*909 HRS answered with a general denial and asserted various affirmative defenses. Subsequently, HRS moved for summary judgment on all claims, asserting sovereign immunity, collateral estoppel, lack of subject matter jurisdiction, and Legal Services' lack of standing. The trial court entered summary judgment for HRS without specifying the grounds.
On appeal, the Third District held: (1) B.J.M. was not entitled to a writ of mandamus compelling HRS to place him in a more appropriate placement; (2) sovereign immunity barred a negligence action against HRS for improper placement; (3) HRS's negligent failure to provide necessary services was not protected by sovereign immunity; (4) collateral estoppel did not bar B.J.M.'s action for damages; and (5) section 39.455, Florida Statutes (1991), which provides immunity for HRS's failure to comply with a performance agreement, did not bar B.J.M.'s negligence action. The court also certified to this Court the issue of whether HRS may be sued in tort for general damages for failing to provide a minor with services.

FACTS[1]
B.J.M. presents a classic picture of a child in need of help from the community. He is an abused, neglected, and abandoned child who has been diagnosed as borderline retarded, and adjudicated both dependent and delinquent in the juvenile justice system. B.J.M. was born on December 25, 1973, and was subsequently abandoned by his parents. He was raised by a woman whom he knew as his grandmother, although she denied any blood ties to him. In March 1987, at age 13, B.J.M. was adjudicated dependent on the basis of neglect and abandonment. The "grandmother" who raised him refused to continue her care, and another relative also refused to accept him.
Upon being adjudicated dependent, and pursuant to statutory mandate, HRS prepared a performance agreement/permanent placement plan for B.J.M. which was approved by the juvenile court. No relative of B.J.M. was a party to that agreement. In the plan HRS agreed to "see that the child is enrolled in appropriate school setting" and "see that counseling is provided for child at the Health and Rehabilitative Services placement." Thereafter, B.J.M. was placed in three successive foster homes. One returned him to HRS custody because he had exhibited inappropriate sexual behavior, and his foster parent feared for the safety of young female relatives in the home. He ran away from another home, and was claimed to be ungovernable in the third. During this time B.J.M. was also provided counseling, but it was eventually discontinued because he refused to talk to the therapist.
In June 1989, at age 15, B.J.M. was adjudicated delinquent for committing attempted arson. At a disposition hearing to determine sanctions and treatment, the juvenile court recommended, as its first preference, placement of B.J.M. at Hillsborough Alternative Residential Program (HARP), a facility specializing in juvenile sex offenders.[2] However, acting within its discretionary authority, HRS placed B.J.M. at Montanari Clinical School, a placement choice ranked third by the court. Montanari is a privately owned residential treatment facility which has its own school on the premises. The district court characterized this facility as a "state sanctioned warehouse for troubled youths." 627 So.2d at 518.
In August 1989, B.J.M. was again adjudicated delinquent, this time for burglary of a dwelling. The court recommended that he remain at Montanari. The court also appointed Christina Zawisza, an attorney with Legal Services of Greater Miami, to thereafter serve as guardian ad litem for B.J.M.
While at Montanari, B.J.M. exhibited inappropriate sexual and other aggressive behavior, and was assigned to the "Paisano" unit, the most restrictive environment at the facility. Although B.J.M. attended classes at Montanari, he did not receive training for a specific vocation. Rather, he was taught general skills such as: learning to relate to *910 others, taking responsibility, and being on time. Montanari discontinued his group therapy because, in the words of his foster care worker, B.J.M. "could not be motivated to face" issues involving his sexual conduct. Consequently, he received no therapy to address his sexual behavior.
Every two weeks B.J.M. received counseling relating to his goals and future plans, although the counseling sessions frequently lasted only ten minutes. Although a referral to Grant Center had been recommended in 1987, it never took place. Grant Center is a highly structured residential treatment center in South Dade County, Florida. It offers a specialized sexual offender/victim treatment program.
Following numerous statutory reviews in the dependency proceedings, the juvenile court consistently found B.J.M.'s placements appropriate. However, the court indicated that although Montanari was not an inappropriate placement, HARP would be preferred by the court. None of the court orders reviewing and approving B.J.M.'s placements were ever appealed.

LAW & ANALYSIS

Jurisdictional Objections
Initially, we address HRS's jurisdictional objections to the action. HRS first claims that collateral estoppel bars any claims by B.J.M. concerning his care by HRS because at each judicial review the
court specifically found that B.J.M. was "appropriately placed" and that HRS had complied with its duties toward him... . In order to find that HRS was "in compliance" with its duties, the juvenile court judge necessarily had to find that the deficiencies alleged in the guardian ad litem's written reports did not constitute violations of the duties imposed upon HRS by law... . Thus, as to all matters relating to B.J.M.'s care and placement ... the doctrine of collateral estoppel bars relitigation.
Petitioner's Initial Brief at 39, 40.
Collateral estoppel is a judicial doctrine which in general terms prevents identical parties from relitigating the same issues that have already been decided. Mobil Oil Corp. v. Shevin, 354 So.2d 372, 374 (Fla. 1977). The essential elements of the doctrine are that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction. Id. The courts have emphasized that collateral estoppel precludes relitigation of issues actually litigated in a prior proceeding. See Hochstadt v. Orange Broadcast, 588 So.2d 51 (Fla. 3d DCA 1991). The district court held that collateral estoppel does not bar an action for damages, and reasoned that:
The prior judicial reviews of B.J.M.'s placement did not determine whether HRS had breached a duty of care to B.J.M.; the orders indicate that the court merely noted, with some reluctance, that the placements were not inappropriate. The parties never litigated before the juvenile court the issue of whether HRS breached a duty of care once it placed B.J.M. in Montanari.
627 So.2d at 517-18. We agree with the district court's reasoning and analysis on this issue.
We next consider HRS's claim that the filing of a civil action in the general jurisdiction division of the circuit court constitutes an unlawful interference with the jurisdiction of the juvenile division of the circuit court. Again we agree with the district court's rejection of this claim. This case was properly within the circuit court's general jurisdiction division since the complaint sought civil relief in mandamus and tort law. The filing of such a claim does not interfere with the authority of the juvenile division of the court which is organized to consider dependency and delinquency actions. The internal operation of the court system and the assignment of judges to various divisions does not limit the circuit court's jurisdiction. In re Peterson, 364 So.2d 98, 99 (Fla. 4th DCA 1978). "It is the court, and not the particular judges thereof, that has jurisdiction over a particular cause... ." Willie v. State, 600 So.2d 479, 481 (Fla. 1st DCA 1992) (citation omitted).
*911 Finally, we reject HRS's contention that the guardian ad litem did not have standing to sue on behalf of B.J.M. The Juvenile Division Order Appointing Attorney and Guardian Ad Litem granted broad authority for Legal Services' representation of B.J.M. as guardian ad litem. We agree with the district court that there was "nothing improper about Legal Services' role as guardian ad litem in this litigation." 627 So.2d at 514 n. 2. The juvenile court initially entered an order empowering Legal Services to represent B.J.M. not only in juvenile court but also in proceedings outside the court when appropriate. Such representation would appear to be especially appropriate considering the fact that B.J.M. had been abandoned and had no one else to assume the role of legal guardian.

Sovereign Immunity
We next address whether a tort claim for damages based on HRS's placement decisions and alleged failure to provide B.J.M. with adequate services is barred by the doctrine of sovereign immunity. We begin our discussion with a brief historical overview of sovereign immunity in the State of Florida.
Section 768.28, Florida Statutes (1993), waives governmental immunity from tort liability "under circumstances in which the state or [an] agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state." § 768.28(1), Fla. Stat. (1993). In Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1020 (Fla. 1979), we attempted to flesh out the effect of the statutory waiver of immunity and, in doing so, carved out an exception to the waiver of immunity for "policy-making, planning or judgmental government functions." In other words, despite the rather straightforward and broad scope of the waiver of sovereign immunity in section 768.28, we held that certain "discretionary"[3] governmental functions remain immune from tort liability. Id. at 1022. Identifying these functions is done primarily by distinguishing, through a case-by-case analysis, "the `planning' and `operational' levels of decision-making by governmental agencies."[4]Id.
We held in Commercial Carrier that this distinction should be made according to "the preliminary test iterated in Evangelical United Brethren Church v. State," 67 Wash.2d 246, 407 P.2d 440 (1965), as set out in our opinion.[5]Id. Subsequently, in a further attempt to define the parameters of governmental tort liability, we modified this approach. In Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985), we explained that before applying the Evangelical Brethren test, the governmental function or activity at issue should be placed in one of four basic categories of government action. These four categories are: (I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens. Id. at 919-21.
*912 In considering governmental tort liability under these four categories, we stated:
[T]here is no governmental tort liability [regarding] the discretionary governmental functions described in categories I and II because there has never been a common law duty of care with respect to these legislative, executive, and police power functions, and the statutory waiver of sovereign immunity did not create a new duty of care.
Id. at 921. On the other hand, we recognized:
[T]here may be substantial government liability under categories III and IV. This result follows because there is a common law duty of care regarding how property is maintained and operated and how professional and general services are performed. It is in these latter two categories that the Evangelical Brethren test is most appropriately utilized to determine what conduct constitutes a discretionary planning or judgmental function and what conduct is operational for which the governmental entity may be liable.
Id. We have since emphasized that these four Trianon categories are "rough" guides rather than inflexible rules. See, e.g., Yamuni, 529 So.2d at 261.
Assuming that a government activity or function is not protected under category I or II, the court must determine what conduct within categories III and IV "constitutes a discretionary planning or judgmental function and what conduct is operational" under the Evangelical Brethren test. Trianon, 468 So.2d at 921. If the questions posed in Evangelical can be clearly and unequivocally answered yes, then the challenged act is probably policy-making, planning, or judgmental activity which is immune from tort liability. If the answer to any of these questions is no, then further inquiry is necessary to determine whether the conduct should be immune. Commercial Carrier, 371 So.2d at 1019; see also Yamuni, 529 So.2d at 260. The essential goal of this further analysis is the same, to distinguish those "policy-making, planning or judgmental government functions" entitled to immunity from those routine operational level actions that are subject to tort liability.

THIS CASE
In this case, there are two governmental activities at issue, the placement decision of HRS and HRS's alleged failure to provide adequate services. These activities are closely related since an inherent component in most placement decisions are the services associated with or available at the placement. With respect to the first activity, HRS's placement of B.J.M. at Montanari, we agree with the district court's conclusion that HRS's choice of a residential treatment facility is shielded by sovereign immunity.
B.J.M. was initially placed at Montanari after he was adjudicated delinquent for committing arson. Several months later, he was again declared delinquent by the juvenile court for committing burglary. Because he was already living at Montanari, the court directed that he remain there. In this placement, HRS was acting pursuant to the broad discretionary authority granted to the agency by the legislature.[6] We believe that this type of discretionary call, regardless of whether we place it in Trianon's category II (enforcement of laws and the protection of the public safety), or category IV (providing professional, educational, and general services for the health and welfare of citizens), is entitled to immunity.
In Trianon, we explained the underlying rationale of category II by stating:
How a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the laws duly enacted by a governmental body is a matter of governance, for which there never has been a common law duty of care. This discretionary power to enforce compliance with the law, as well as the authority to protect the public safety, is most notably reflected in the discretionary *913 power given to judges, prosecutors, arresting officers, and other law enforcement officials... .
468 So.2d at 919. It is undisputed that B.J.M. was placed at Montanari as a delinquent child, not only to provide him remedial treatment, but, in substantial part, to protect the public safety. In our view, this placement decision was sufficiently related to public safety to immunize it from tort liability under category II.
However, as the following analysis with regard to services suggests, we believe HRS would be entitled to immunity for its discretionary placement decisions even under Trianon's category IV. As we have already noted, HRS is vested with broad discretion in exercising its placement authority. For this reason, we believe the placement function constituted a "discretionary planning or judgmental function" entitled to immunity even if considered as a category IV function. Id.
We also believe the same immunity accorded to placement decisions applies to the discretionary decisions made by HRS in allocating services to dependents and delinquents under the statutory scheme mandated by the legislature. This scheme provides the same broad discretion for allocating services as for placement decisions.
At the outset, we distinguish the HRS function at issue, the allocation of services, from the actions at issue in Department of Health & Rehabilitative Services v. Whaley, 574 So.2d 100 (Fla. 1991), and Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258 (Fla. 1988). Both Whaley and Yamuni involved HRS caseworker-level decisions concerning the physical safety of children within the agency's protective custody which did not implicate any "discretionary planning or judgment function" as contemplated by Trianon. Neither case involved discretionary calls with regard to choice of services. Whaley involved the physical placement of a child in a specific room in an HRS detention facility known by HRS to be occupied by dangerous juveniles. We held that placing the child in such danger was an operational function not protected by sovereign immunity. 574 So.2d at 101. In Yamuni, we held that HRS's negligent failure to adequately protect a child from further physical abuse also occurred on an operational level. 529 So.2d at 260. These operational level decisions exposing children to specific dangers should be distinguished from the broad discretionary authority vested by the legislature in HRS to determine an appropriate course of remedial treatment for the children that come within its custody through dependency and delinquency proceedings.
In Commercial Carrier and Trianon we set out a general method of analysis to classify government activities entitled to immunity. In both cases we approved a preliminary four-part test from the Washington case of Evangelical as a starting point. The test from Evangelical poses four questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the government agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? Affirmative answers to these questions should usually give rise to immunity for the questioned activity. While these questions may be rather general, and somewhat imprecise, we believe they can all be answered in the affirmative here. Decisions as to the allocation of services to children implicate a core discretionary function of HRS as delegated and directed by the legislature.
In addition, however, when the Evangelical test leaves the issue in doubt, we have adopted the framework articulated in Lipman v. Brisbane Elementary School District, 55 Cal.2d 224, 11 Cal. Rptr. 97, 359 P.2d 465, 467 (1961), for further analysis:
Although it may not be possible to set forth a definitive rule which would determine in every instance whether a governmental *914 agency is liable for discretionary acts of its officials, various factors furnish a means of deciding whether the agency in a particular case should have immunity, such as the importance to the public of the function involved, the extent to which government liability might impair free exercise of the function, and the availability to individuals affected of remedies other than tort suits for damages.
Commercial Carrier, 371 So.2d at 1021.[7] We believe this framework is particularly helpful for resolution of this case.
It is apparent that the HRS function involved herein, caring for children, is of fundamental and critical importance to the public. Indeed, HRS is one of the primary means by which adult society carries out its implicit obligation to care for those who, by reason of age and unfortunate circumstances, cannot care for themselves and have no one else to care for them. It is also apparent, in our view, that making HRS liable for tort damages for its mistakes in judgment in carrying out this task would considerably impair the exercise of that function. Parents, for instance, are granted almost unlimited discretion in carrying out similar responsibilities. It is the rare case where the State will intervene, and the rarer case still that the State will impose tort liability for parental actions. Similarly, the courts, through tort actions, are ill-suited to second-guess HRS's decisions as to the provision and choice of services each time there is an unsatisfactory outcome. Finally, as to the availability of other remedies, we note that an entire juvenile court system has been set up to supervise HRS's function in delinquency and dependency cases and to provide a remedy for any default. Based on this analysis, we disagree with the district court's conclusion that the "agency's alleged failure to provide necessary services to B.J.M. is operational, rather than planning-level activity, and is actionable." 627 So.2d at 517.
While the above analysis may seem technical and somewhat imprecise, we also believe the reasoning of the decisions which have recognized governmental immunity with respect to claims for educational malpractice may be applied here. Courts, including those in Florida, have rejected claims of educational malpractice as a tort action for a variety of reasons, one being that it would offend the separation of powers between the three branches of government. See Tubell v. Dade County Pub. Schools, 419 So.2d 388 (Fla. 3d DCA 1982). The district court applied this reasoning to immunize HRS's placement decisions, but did not extend it to HRS's decisions as to the provision of services. We believe it applies to both functions. The decisions concerning the allocation of educational services to children implicate the same or similar public concerns and policies as are implicated in the allocation of services for children by HRS.
For example, in Hoffman v. Board of Education, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979), the plaintiff was erroneously diagnosed as mentally retarded and was placed for virtually his entire school career in classes for the mentally retarded. In denying the student's claim for damages, the court reasoned that a tort action was not a proper tool to supervise decisions of the school authorities. The court stated:
In order to affirm a finding of liability in these circumstances, this court would be required to allow the finder of fact to substitute its judgment for the professional judgment of the board of education as to the type of psychometric devices to be used and the frequency with which such tests are to be given. Such a decision would also allow a court or a jury to second-guess the determinations of each of plaintiff's teachers. To do so would open the door to an examination of the propriety of each of the procedures used in the education of every student in our school system. Clearly, each and every time a student fails to progress academically, it can be argued that he or she would have done better and received a greater benefit if another educational approach or diagnostic tool had been utilized. Similarly, whenever *915 there was a failure to implement a recommendation made by any person in the school system with respect to the evaluation of a pupil or his or her educational program, it could be said, as here, that liability could be predicated on misfeasance.
Id. at 379, 400 N.E.2d at 320.
In Peter W. v. San Francisco Unified School District, 60 Cal. App.3d 814, 131 Cal. Rptr. 854 (1976), where the plaintiff alleged, inter alia, that he suffered from reading disabilities and that the school district was negligent both by failing to discover the disabilities and by placing him in inappropriate classes, the California appellate court rejected the claim, reasoning:
Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury. The science of pedagogy itself is fraught with different and conflicting theories of how or what a child should be taught, and any layman might  and commonly does  have his own emphatic views on the subject. The "injury" claimed here is plaintiff's inability to read and write. Substantial professional authority attests that the achievement of literacy in the schools, or its failure, are [sic] influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process, and beyond the control of its ministers. They may be physical, neurological, emotional, cultural, environmental; they may be present but not perceived, recognized but not identified.
We find in this situation no conceivable "workability of a rule of care" against which defendants' alleged conduct may be measured, no reasonable "degree of certainty that ... plaintiff suffered injury" within the meaning of the law of negligence, and no such perceptible "connection between the defendant's conduct and the injury suffered," as alleged, which would establish a causal link between them within the same meaning.
Id. 131 Cal. Rptr. at 860-61 (footnotes & citations omitted).
Similar reasoning has been utilized to reject claims that have arisen in a variety of educational settings. See Donohue v. Copiague Union Free School Dist., 47 N.Y.2d 440, 418 N.Y.S.2d 375, 377-78, 391 N.E.2d 1352, 1354 (1979) ("To entertain a cause of action for `educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies ... but, more importantly, to sit in review of the day-to-day implementation of these policies."); see also D.S.W. v. Fairbanks N. Star Borough School Dist., 628 P.2d 554 (Alaska 1981) (holding that action for damages could not be maintained against school district for negligent classification, placement, or teaching of students suffering from dyslexia); Smith v. Alameda County Social Services Agency, 90 Cal. App.3d 929, 153 Cal. Rptr. 712 (1979) (holding no cause of action was stated when plaintiff alleged that he had been negligently placed in a class for mentally retarded when school district knew or should have known that he was not retarded); Hunter v. Board of Educ., 292 Md. 481, 439 A.2d 582 (1982) (holding that action against school board and elementary school principal and teacher for negligently evaluating child's learning abilities could not be maintained).[8]
*916 Decisions on how to properly care for a dependent child or rehabilitate a delinquent juvenile, and to assess the need for counseling, education, and vocational training are discretionary judgmental decisions to be made pursuant to the broad discretion vested in HRS by the legislature. These decisions represent the cutting edge of HRS policy. Additionally, it is apparent that both the nature of and the amount of services that may be provided is limited by HRS resources, and by the legislative-executive policy decisions as to what resources to provide and how those resources may be utilized.
HRS, along with other governmental agencies in this state, must constantly take into account practical considerations, such as budgetary constraints, when deciding how to allocate its limited funds among a virtually unlimited number of needs. See Avallone v. Board of County Comm'rs, 493 So.2d 1002, 1009 (Fla. 1986) (McDonald, C.J., dissenting). As a result, in setting up its programs and providing services, HRS is to a great extent financially "strait-jacketed." When there are thousands of children in need and resources provide for only a fraction, decisions as to allocation may be difficult and sometimes arbitrary. For the courts to impose liability for tort damages on HRS for decisions as to the provision of services would not only "saddle [it] with a potentially crushing burden of financial liability, but would also [cause] the judicial branch of government to trespass into the domain of the legislative branch." Id. at 1007.
For all of these reasons, we conclude that HRS's decisions as to the allocation of services involve an exercise of broad discretionary executive power vested in the agency by the legislature that is immune from tort liability. The vesting and exercise of such authority involve fundamental questions of legislative and executive policy and planning.
Granted, HRS walks a fine line in carrying out its responsibilities. This Court, as evidenced by the decisions in Whaley and Yamuni, will not hesitate to subject the agency to tort liability when its negligently conducted operational level activities expose children to specific foreseeable dangers that result in physical injuries to children.

Section 39.455, Florida Statutes (1991)
Our conclusion that HRS's failure to provide certain services to B.J.M. is shielded by sovereign immunity is also supported by the express provisions of section 39.455, Florida Statutes (1991). Section 39.455, Florida Statutes (1991), provides in relevant part:
(1) In no case shall employees or agents of the social service agency acting in good faith be liable for damages as a result of failing to provide services agreed to under the performance agreement or permanent placement plan unless the failure to provide such services occurs as a result of bad faith or malicious purpose or occurs in a manner exhibiting wanton and willful disregard of human rights, safety, or property.
(2) The inability or failure of the social service agency or the employees or agents of the social service agency to provide the services agreed to under the performance agreement or permanent placement plan *917 shall not render the state or the social service agency liable for damages unless such failure to provide services occurs in a manner exhibiting wanton or willful disregard of human rights, safety, or property.
The Third District in this case held that the above section "does not bar the negligence action against HRS." 627 So.2d at 518. Its reasoning was as follows:
B.J.M.'s negligence action is not based on the agency's failure to comply with its performance agreement, but rather on its failure to comply with the general legislative mandate to "assure to all children brought to the attention of the courts, either as a result of their misconduct or because of neglect or mistreatment by those responsible for their care, the care, guidance, and control ... which will best serve the moral, emotional, mental, and physical welfare of the child and the best interests of the state." § 39.001(2)(d), Fla. Stat. (1991).[9]
Id. (emphasis added). However, it is undisputed that HRS was providing services to B.J.M. pursuant to a permanent placement plan established by court order. This placement plan fleshed out, in express terms, the statutory obligations of HRS to B.J.M. cited by the district court.
Section 39.455(2) impliedly creates a duty on the part of HRS and its agents and employees not to act "in a manner exhibiting wanton or willful disregard of human rights, safety, or property" with respect to its failure to provide services under a permanent placement plan. In other words, section 39.455 does not absolutely bar an action. Rather, these statutory provisions implicitly bar any action against HRS and its employees except where the agency or its employees act willfully or wantonly. Here, B.J.M. did not attempt to assert a claim based on willful and wanton conduct as described in this section.

CONCLUSION
In sum, despite the allegations that the State has failed one of its children in great need, we are compelled to conclude that the doctrine of sovereign immunity and section 39.455, Florida Statutes (1991), bar a tort action for damages against HRS for the alleged negligent allocation of services to dependent and delinquent children. B.J.M. and others like him can only hope that the legislative and executive branches of government will summon the will to respond to their needs. We approve in part and quash in part the decision below and remand for proceedings consistent with this opinion.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING and WELLS, JJ., concur.
NOTES
[1] These facts, with some minor editing, are taken substantially from the district court opinion. See B.J.M., 627 So.2d at 513-14.
[2] Throughout the record there are references to B.J.M. as a juvenile sex offender, and indications that he was both victim and victimizer.
[3] The term "discretionary" as used in this context means that the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning. Kaisner v. Kolb, 543 So.2d 732, 737 (Fla. 1989) (citing Department of Health & Rehabilitative Services v. Yamuni, 529 So.2d 258, 260 (Fla. 1988)).
[4] An "operational" function is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented. Kaisner, 543 So.2d at 737.
[5] The test from Evangelical involves posing four preliminary questions: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the government agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?
[6] See § 39.09, Fla. Stat. (1989). The Third District correctly described this as a grant of "almost total discretion in the area of placement." This "total discretion" was the basis for the district court's decision upholding the denial of mandamus as well as the negligent placement claim. 627 So.2d at 515.
[7] For an illustration of this type of analysis, see Comuntzis v. Pinellas County School Board, 508 So.2d 750, 753 (Fla. 2d DCA 1987); Bellavance v. State, 390 So.2d 422, 424-25 (Fla. 1st DCA 1980), review denied, 399 So.2d 1145 (Fla. 1981).
[8] Florida courts have also recognized the broad discretion afforded to government agencies that allocate public services. In Steinhardt v. Town of North Bay Village, 132 So.2d 764 (Fla. 3d DCA 1961), cert. discharged, 141 So.2d 737 (Fla. 1962), plaintiffs sued the city for failing to provide adequate fire protection services. The district court affirmed the trial court's dismissal of the complaint, and stated:

[T]he elected officials of the city were undertaking to perform functions which required an exercise of legislative or quasi legislative powers, and the consequences of their acts, even if improperly performed, cannot be made subject to civil liability.
Id. at 767. In City of Daytona Beach v. Palmer, 469 So.2d 121, 122 (Fla. 1985), we held that a governmental entity was not liable in tort for negligent discretionary decisions of firefighters:
The decisions of how to properly fight a particular fire, how to rescue victims in a fire, or what and how much equipment to send to a fire, are discretionary judgmental decisions which are inherent in this public safety function of fire protection. .. . To hold a city liable for the negligent decisions of its fire-fighters would require a judge or jury to second guess fire-fighters in making these decisions and would place the judicial branch in a supervisory role over basic executive branch, public functions in violation of the separation of powers doctrine.
Id. at 123. In Wong v. City of Miami, 237 So.2d 132 (Fla. 1970), we extended the same reasoning to police services. Besides fire and police protection, courts have consistently held that governmental tort liability does not arise from a government's failure to provide a wide variety of services. See, e.g., Dennis v. City of Tampa, 581 So.2d 1345, 1350 (Fla. 2d DCA) (park patron supervision), review denied, 591 So.2d 181 (Fla. 1991); Eder v. Department of Highway Safety, 463 So.2d 443 (Fla. 4th DCA) (patrol officers at congested intersections), review denied, 475 So.2d 694 (Fla. 1985); Griffin v. City of Quincy, 410 So.2d 170, 173 (Fla. 1st DCA 1982) (electricity to residents), review denied, 434 So.2d 887 (Fla. 1983); Ellmer v. City of St. Petersburg, 378 So.2d 825 (Fla. 2d DCA 1979) (warnings of riot conditions).
Please note that the discretionary firefighting decisions in Palmer are distinguishable from "negligent conduct resulting in personal injury while fire equipment is being driven to the scene for a fire or personal injury to a spectator from the negligent handling of equipment at the scene. Governmental entities are clearly liable for this type of conduct as a result of the enactment of section 768.28, Florida Statutes (1983)." Palmer, 469 So.2d at 123.
[9] This subsection was subsequently repealed in 1994. Ch. 94-209, § 9, Laws of Fla.