DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITY OF FORT LAUDERDALE**,
Appellant,

v.

**WALTER HINTON,** et al.,
Appellee.

No. 4D18-2089

[July 24, 2019]

Appeal of nonfinal order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Patti Englander Henning, Judge; L.T. Case No. 07-30358 26.

William M. Droze of Troutman Sanders LLP, Atlanta, Georgia, and W. Tucker Craig and Jeffery R. Lawley of Billing, Cochran, Lyles, Mauro, Ramsey, P.A., Fort Lauderdale, for appellant.

Michelle D. Cofiño and Reginald J. Clyne of Quintairos, Prieto, Wood & Boyer, P.A., Miami, and Hunter Shkolnik, Louise R. Caro and Aaron R. Modiano of Napoli Shkolnik, PLLC, Coconut Grove, for appellees.

PER CURIAM.

The City of Fort Lauderdale ("the City") appeals two orders denying its motions for summary judgment. The City contends that these are appealable nonfinal orders under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(xi) because the orders determine, as a matter of law, that the City is not entitled to sovereign immunity. The City raises five points on appeal. We affirm in part and dismiss in part, concluding that some points, which do not involve immunity from suit as a matter of law, are not reviewable under the nonfinal appeal rule.

*Background*

In the underlying case, five members of the Hinton family ("the Hintons") are suing the City for actions and omissions that followed the City's operation of an incinerator before 1953 at the Lincoln Park

Complex.[1]  The Hintons allege the City caused or allowed ash and other contaminants from the incinerator site to disburse throughout the neighboring community.  The Hintons allege that the hazardous substances physically injured them and they have lost use of their property and suffered reduced market value.

*The Lincoln Park Complex and Durrs Neighborhood*

The City-owned Lincoln Park Complex includes three principal parcels: (1) a parcel which has been the site for a trash transfer and recycling station since 1997; (2) a parcel which is currently the site for the City's One Stop Shop for municipal services, and previously was the site of an elementary school until 2005; and (3) a grassy field that includes Lincoln Park.  A portion of the first parcel served as a wastewater treatment plant from the 1920s until 1997, and another portion of the first parcel was the site for a municipal waste incinerator from 1936 until 1953 and thereafter a second wastewater treatment facility from 1971 until 1983.  The area that is now a public park in the third parcel previously held piles of incinerator ash.

As to the two portions of the first parcel used as a wastewater treatment plant, the Hintons believe the wastewater treatment may have created high levels of dioxins that were released into the air, groundwater, and soil.  The original wastewater treatment plant was demolished in 1997, and the trash transfer station was constructed in its place.  Prior to the construction of the trash transfer station, the City had evaluated redevelopment of the incinerator-wastewater treatment plant site and conducted Phase I and Phase II environmental testing of the soil and water.  Arsenic, barium, lead, and benzo(a)pyrene were detected in soil samples.  The amounts detected allegedly exceeded some residential regulatory thresholds.  At that time, the City decided not to redevelop and did not conduct any additional environmental testing or remediate any contamination.

Several years later, in 2000, the City discussed potential construction of the One Stop Shop at the former elementary school site and ordered Phase II testing for the site.  The Florida Department of Environmental Protection ("FDEP") conducted independent testing at the Lincoln Park Complex.  Sampling occurred between 2002 and 2003, and the park was closed for remediation activity.  In 2003, FDEP allowed the construction to proceed, agreeing that the environmental conditions at the school

---

[1] There are approximately 113 plaintiffs with similar claims pending in the trial court.

property should not affect construction of the One Stop Shop. In 2003, the City dewatered the site to install utilities for the One Stop Shop, and contaminated ground water flooded the neighborhood. During a partial remediation and capping of Lincoln Park, piles of contaminated soil were left uncovered for extended periods, including when hurricanes struck the area.

The Hintons complain that the City did not remediate or notify residents after the 1997 testing revealed contamination. The park was not fenced until 2002, and the City only posted "no trespassing" signs. It did not warn of possible contamination, and children continued to play in the area.

Between 2004 and 2006, FDEP collected soil samples in the residential neighborhoods. Polycyclic aromatic hydrocarbons ("PAHs") exceeding State of Florida Soil Cleanup Target Levels ("SCTLs") were detected on one of the Hintons' properties. One sample also showed an arsenic level above residential regulatory thresholds. Sampling of other homeowners' lots detected other contaminants. Residents learned of the contamination from the State around 2005.

After evaluating soil sample results, the Florida Department of Health issued a report in 2007 concluding that chronic exposure to contamination in the surrounding neighborhoods could create elevated health risks for sensitive subpopulations, like children with developmental disabilities. Because contaminants were at higher concentrations below the surface, there was some indication that incinerator ash may have been used as fill for residential properties and digging in subsurface soils could increase exposure risk. Some contaminants were at concentrations above SCTLs, but the report found low to no apparent increased cancer risk from long term exposure to the highest levels of detected contaminants. Further soil testing was recommended. Residents with ash, glass, or metal pieces in their soil were advised to only grow fruits and vegetables in raised beds with clean soil. The report also concluded that based upon distribution and measured levels, PAHs in the Durrs neighborhood did not appear to be related to the Lincoln Park Complex. But, plaintiffs allege that FDEP reached a different conclusion, finding that the PAHs and arsenic were related to the complex.

In 2008 and 2009, FDEP worked with the City to address potential impacts on residents. FDEP recommended that surface soil at the incinerator site be remediated to residential SCTLs, covered with backfill, or removed. FDEP also required additional testing of the complex.

The Hintons allege that contamination was discharged from the complex on multiple occasions, during: (1) operation of the incinerator site; (2) operation of the wastewater treatment and waste transfer site; (3) demolition of the Lincoln Park Elementary School; (4) excavation of the school site during construction of the One Stop Shop; (5) release of ash and contaminated water during construction and remediation; and (6) residential development (if ash was used as fill in the Durrs neighborhood).

The Hintons further allege that they have ingested, inhaled, and touched contaminants from the soil and ground water through walking, playing, and gardening in the neighborhood or consuming well water or foods grown on their property. The Hintons' oldest daughter died from a rare uterine cancer in 2010, and experts disagree about whether her cancer could have been related to the incinerator site. The Hintons also allege that they have lost uses of their property and that home values have been damaged by the stigma.

*The Hintons' complaint*

The Hintons brought the underlying action in 2007. The operative complaint raises five counts. Count I seeks strict liability damages under section 376.313, Florida Statutes, for discharge of hazardous substances from the Lincoln Park Complex. Count II seeks damages for negligence from failing to warn of a hazardous condition; allowing discharge of contaminated soil; failing to remediate contamination and use reasonable care in remediation; and other breaches that have allegedly caused the Hintons physical injury, emotional distress, and property damage, including lost use and diminished value. Count III asks the court, through permanent injunction, to require the City to fund a court-supervised medical monitoring program. Count IV seeks compensation for inverse condemnation, alleging the discharge of contaminants onto the Hintons' properties constitutes a taking. Count V alleges a violation of substantive due process if the City's actions did not constitute a taking.[2]

*The orders denying summary judgment*

In October 2012, the trial court denied the City's motions for summary judgment against Walter and Joan Hinton. In part, the court rejected the City's argument that, because no waiver of sovereign immunity exists for a claim of strict liability against the government, the Hintons cannot maintain a claim for damages under section 376.313.

---

[2] The trial court granted summary judgment for the City on this count.

4

The City filed additional motions for summary judgment in March 2016 and July 2017. Following a hearing, the court denied these motions. In the first order on appeal, the court concluded that sovereign immunity does not apply to the claim for medical monitoring because this is a claim in equity, as recognized in *Petito v. A.H. Robins Co.*, 750 So. 2d 103, 105 (Fla. 3d DCA 1999). The court reasoned that, contrary to claims for money damages, claims in equity are not subject to the limitations for tort liability in section 768.28(5), Florida Statutes. The court concluded that the Hintons' claims for damages under section 376.313 and the negligence claim are subject to the sovereign immunity waiver caps in section 768.28(5). Inverse condemnation claims are not subject to the caps. The court also disagreed with the City that the Hintons' claims constitute a "single occurrence" for purposes of the sovereign immunity waiver caps.

In the second order on appeal, the trial court rejected the City's argument that it was entitled to immunity on claims that it failed to act following environmental testing in 1997 because this involved planning-level decisions related to site development. The court denied summary judgment as to the negligence claim, inverse condemnation claim, and claim for damages under section 376.313, finding no immunity. The court again concluded that the medical monitoring claim is not subject to the sovereign immunity caps and that the City has no immunity to this claim.

*Appellate Analysis*

The City raises five points on appeal: (1) the medical monitoring claim is completely barred because there is no waiver of sovereign immunity for a claim in equity; (2) a claim for strict liability for discharge of hazardous substances under section 376.313 is completely barred because the sovereign immunity waiver statute applies only to negligence and the discharge statute does not include an express waiver of sovereign immunity; (3) if medical monitoring is a negligence claim, then it is subject to the per occurrence cap, and the City believes damages for all of the Hintons' claims combined are capped at $200,000 because there is only a single occurrence – the operation of the incinerator; (4) the trial court erred in ruling that there is no sovereign immunity for the inverse condemnation claim without determining that the Hintons established a legally sufficient takings claim; and (5) sovereign immunity bars claims related to the City's failure to conduct further testing or remediation because these were planning-level functions related to site redevelopment.

This Court has appellate jurisdiction to review a nonfinal order determining "as a matter of law" that a party is not entitled to sovereign immunity. Fla. R. App. P. 9.130(a)(3)(C)(xi). The rule is intended to allow

interlocutory review where material facts are not in dispute and a trial court has denied *immunity from suit* as a matter of law. Based on this jurisdictional standard, we do not agree that all of the City's points are reviewable by nonfinal appeal.

*The medical monitoring claim*

The trial court ruled that there is no sovereign immunity for the medical monitoring claim because it is a claim in equity. The City does not dispute that it is a claim in equity, but argues there is no equity exemption to sovereign immunity. Additionally, the City argues that there is no express statutory waiver of sovereign immunity for this claim because the claim is not based upon a statute.

Section 768.28 provides a limited waiver of sovereign immunity for torts for the negligent or wrongful acts or omissions of a municipality, but "only to the extent specified in this act." § 768.28(1), Fla. Stat. (1999). Section 768.28 does not include a waiver for claims in equity. The City argues alternatively that, if the claim is not barred by sovereign immunity, then the statutory caps on damages in section 768.28(5) apply.

The Hintons believe that the trial court correctly determined that sovereign immunity does not apply to a claim in equity. Relying on Justice Cantero's concurring opinion in *American Home Assurance Co. v. National Railroad Passenger Corp.*, 908 So. 2d 459 (Fla. 2005), the Hintons also argue that this Court should affirm because section 768.28 affects the State and its subdivisions differently from municipalities, and sovereign immunity for municipalities should be strictly construed. However, we rejected this argument in *Town of Gulf Stream v. Palm Beach County*, 206 So. 3d 721 (Fla. 4th DCA 2016), and instead adhered to the Florida Supreme Court's declaration in *Cauley v. City of Jacksonville*, 403 So. 2d 379 (Fla. 1981), "that sovereign immunity should apply equally to all constitutionally-authorized governmental entities." 206 So. 3d at 725 n.2.

Like Judge Altenbernd in *City of Treasure Island v. Provident Management Corp.*, 738 So. 2d 357 (Fla. 2d DCA 1999), *quashed*, 796 So. 2d 481 (Fla. 2001), we have not found an equity exemption to sovereign immunity. *See id.* at 361.

The Hintons point to cases for declaratory or injunctive relief against governmental entities that proceeded without an express waiver of sovereign immunity. But, these examples, which relate to inverse condemnation and collection of unauthorized taxes or fees, involved constitutional violations. Sovereign immunity does not exempt the

government from a challenge to a constitutional violation. *Dep't of Revenue v. Kuhnlein,* 646 So. 2d 717, 721 (Fla. 1994). However, these examples are not comparable to the Hintons' medical monitoring claim.

The Hintons also contend that the denial of sovereign immunity to this claim should be affirmed where negligence is a necessary element for medical monitoring, and because the claim is grounded in negligence, the statute waiving sovereign immunity for tortious conduct (section 768.28) applies and the City is thus not immune from suit as a matter of law. We agree. Accordingly, although the trial court did not base its ruling on this basis, we affirm the denial of sovereign immunity as to this claim. *Dade Cty. Sch. Bd. v. Radio Station WQBA,* 731 So. 2d 638, 644 (Fla. 1999) ("[I]f a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record.").

*The statutory caps issue*

If medical monitoring is not barred by sovereign immunity, the City argues this Court should hold that this claim and all other negligence claims are collectively subject to a $200,000 cap on all claims by the Hintons for single occurrence related to operation of the incinerator. The City contends that the Hintons cannot separate aggregate negligent acts in order to exceed the "incident or occurrence" caps. *See* § 768.28(5), Fla. Stat.

The Hintons disagree that there is only a single occurrence. They contend that separate and distinct acts and omissions by the City over more than 40 years have caused contamination to spread. They also disagree that the contamination is solely from the incinerator site and attribute it to three properties within the complex. The Hintons believe distinct acts of wrongdoing permit recovery for multiple incidents.

Questions about whether the statutory caps in section 768.28(5) apply to medical monitoring and questions about how many incidents or occurrences the Hintons can recover for exceed our nonfinal appeal jurisdiction. In expanding the nonfinal appeal rule, the Florida Supreme Court intended to allow interlocutory review of an order denying *immunity from suit. See Keck v. Eminisor,* 104 So. 3d 359, 364-66 (Fla. 2012) (discussing *Tucker v. Resha,* 648 So. 2d 1187 (Fla. 1994), explaining the rationale for allowing interlocutory review because immunity from suit cannot be restored once lost, and directing the rules committee to submit a proposed rule change); *see also Fla. Fish & Wildlife Conservation Comm'n v. Jeffrey,* 178 So. 3d 460, 465 (Fla. 1st DCA 2015) (dismissing certiorari

review of a sovereign immunity claim, recognizing that limited immunity from liability is not immunity from suit, and the benefit of immunity from liability is not lost if review has to await a final judgment).  The parties have not cited any cases where the applicability of statutory damage caps was reviewed on nonfinal appeal.

In a footnote in *Department of Financial Services v. Barnett*, 262 So. 3d 750 (Fla. 4th DCA 2018), *review granted*, No. SC19-87, 2019 WL 1123751 (Fla. Mar. 12, 2019), we commented that a ruling on the number of occurrences for the sovereign immunity caps could be reviewed by nonfinal appeal because this relates to sovereign immunity as a matter of law.  *Id.* at 752 n.2.  But, we did not need to reach the issue because the declaratory judgment in that case was final and the ruling was reviewed on direct appeal.  *Id.*

In *G4S Secure Solutions (USA), Inc. v. Morrow*, 210 So. 3d 92 (Fla. 2d DCA 2016), the Second District on nonfinal appeal reversed an order denying a motion for summary judgment based upon limited sovereign immunity.  *Id.* at 93-94.  The court concluded that an individual transporting a prisoner, who was killed by another inmate, and the transportation company were entitled to limited sovereign immunity under section 768.28(5) as agents of the State.  *Id.*  The court found that there were no questions of fact that precluded summary judgment.  *Id.* at 96. The opinion did not discuss jurisdiction.

If the statutory caps in section 768.28(5) apply, then the City is not immune from suit.  *See Gerard v. Dep't of Transp.*, 472 So. 2d 1170, 1172 (Fla. 1985) (holding that payment of the maximum permitted by section 768.28(5) did not preclude a negligence action to establish government liability to support a claims bill; in other words, the Department was not immune from suit above the cap); *Pub. Health Tr. of Miami-Dade Cty. v. Rolle*, 88 So. 3d 191, 193 (Fla. 3d DCA 2011) (recognizing that "even if the [plaintiffs] have been paid the statutory maximum permitted under the statute, the trial court still has jurisdiction to enter a judgment against the Trust for purposes of supporting a potential claims bill to the legislature.").  The City still has to defend this action.  Any error at trial in misconstruing the number of occurrences and the extent of the City's liability can be corrected on final appeal.

*The strict liability claim*

The trial court ruled on this issue in a 2012 order.  Although the court revisited the City's arguments in the May 2018 orders, it did not change its ruling.

8

The City mistakenly argues that this issue can be reviewed at any time because it involves subject matter jurisdiction. The Florida Supreme Court has noted that sovereign immunity was once treated as a question of subject matter jurisdiction. *See Dep't of Educ. v. Roe*, 679 So. 2d 756, 758 (Fla. 1996); *see also Citizens Prop. Ins. Corp. v. San Perdido Ass'n*, 46 So. 3d 1051, 1052 (Fla. 1st DCA 2010), *approved*, 104 So. 3d 344 (Fla. 2012). However, recognizing that a claim of sovereign immunity was no longer treated as jurisdictional, the supreme court rejected this as a basis for extraordinary writ jurisdiction. *Citizens Prop. Ins.*, 104 So. 3d at 350-55. Moreover, if the issue was reviewable at any time as the City argues, then there would be no need to include it in the nonfinal appeal rule providing a limited time to appeal. *See* Fla. R. App. P. 9.130(b).

The trial court's ruling in 2012 was prior to the 2014 amendment adding a denial of sovereign immunity as a matter of law to rule 9.130. *In re Amendments to Fla. R. of App. P. 9.130*, 151 So. 3d 1217 (Fla. 2014). But, the City had an available remedy for interlocutory review. Prior to the rule amendment, a nonfinal order denying a claim of immunity from suit could be reviewed by certiorari. *See, e.g.*, *City of Freeport v. Beach Cmty. Bank*, 108 So. 3d 684, 687-88 (Fla. 1st DCA 2013); *see also Citizens Prop. Ins.*, 104 So. 3d at 353 n.6 (discussing situations where certiorari review would not be available and distinguishing those from cases of absolute immunity from suit).

We agree with the Hintons that interlocutory review of this issue is untimely. The City can raise this issue on final appeal if necessary.

*The inverse condemnation claim*

The City contends that the Hintons cannot state a sufficient claim for inverse condemnation because they cannot prove a permanent physical occupation of their land that effectively deprives them of all reasonable and beneficial use and enjoyment of the property. Citing *Florida Fish & Wildlife Conservation Commission v. Daws*, 256 So. 3d 907 (Fla. 1st DCA 2018), the City maintains that, unless the takings claim is facially sufficient, it is barred by sovereign immunity. The Hintons respond that their claim is facially sufficient and involves disputed issues of material fact, which are not appropriate for summary judgment.

We agree with Judge Lewis's dissent in *Daws* that the legal sufficiency of a takings claim is not reviewable by nonfinal appeal. *Id.* at 920 (Lewis, J., dissenting). The City is not immune from suit for inverse condemnation. *See Kuhnlein*, 646 So. 2d at 721 ("Sovereign immunity

9

does not exempt the State from a challenge based on violation of the federal or state constitutions, because any other rule self-evidently would make constitutional law subservient to the State's will. Moreover, neither the common law nor a state statute can supersede a provision of the federal or state constitutions.").

But, even if the sufficiency of a takings claim could be construed as the denial of sovereign immunity as a matter of law, there was no error in the trial court denying summary judgment on this claim. The Hintons have pleaded a facially sufficient takings claim and material facts are in dispute.

Actions for inverse condemnation include "situations where a continuing trespass or nuisance ripens into a constitutional taking of property." *Suarez v. City of Tampa*, 987 So. 2d 681, 684 (Fla. 2d DCA 2008) (quoting *State, Dep't of Health & Rehab. Servs. v. Scott*, 418 So. 2d 1032, 1034 (Fla. 2d DCA 1982)). The Hintons do not have to show that all beneficial use or all value was destroyed. *See, e.g., Young v. Palm Beach Cty.*, 443 So. 2d 450, 451-52 (Fla. 4th DCA 1984); *Kendry v. State Rd. Dep't*, 213 So. 2d 23, 27 (Fla. 4th DCA 1968). A taking occurs when government action deprives a property owner of "*substantially* all economically beneficial or productive use of land." *Tampa-Hillsborough Cty. Expressway Auth. v. A.G.W.S. Corp.*, 640 So. 2d 54, 58 (Fla. 1994) (emphasis added). Contrary to the City's argument, a temporary deprivation can constitute a taking. *Id.* (citing *First English Evangelical Lutheran Church v. Cty. of L.A.*, 482 U.S. 304 (1987)).

The Hintons have pleaded substantial interference with the beneficial use and enjoyment of their property and diminished property values. They allege that they are prevented from opening their windows, growing their own food, gardening, and other outdoor activities. At the summary judgment hearing, counsel pointed out that FDEP told residents not to let their children play in the yards. Potential buyers and mortgage companies have to be told about the contamination. The City responded that the best practices listed on a gardening card issued by the Florida Department of Health was merely a protective measure and did not confirm a problem. The City suggested that because only one soil sample from the Hintons' property showed a problem with arsenic, this did not show a problem with the entire property. Whether contamination found on different properties came from the City properties and whether acts or omissions by the City amount to a temporary or partial taking involve disputed questions of fact.

We conclude that the sufficiency of the takings claim is not reviewable by nonfinal appeal and dismiss this issue. But, even if jurisdiction could lie to review the issue, the trial court properly denied summary judgment.

*The City's discretionary acts arguments*

In its final point, the City argues that any claims for damages based upon the City's failure to remediate or failure to notify residents of the 1997 environmental testing results are barred by sovereign immunity because these are planning-level functions related to site development.

> [A] "discretionary," planning-level function involves "an exercise of executive or legislative power such that a court's intervention by way of tort law would inappropriately entangle the court in fundamental questions of policy and planning." *Mosby v. Harrell,* 909 So.2d 323, 328 (Fla. 1st DCA 2005). An "operational" function, on the other hand, "is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." *Dep't of Health & Rehabilitative Servs. v. B.J.M.,* 656 So.2d 906, 911 n. 4 (Fla.1995); *Mosby,* 909 So. 2d at 328. Operational decisions are not immune.

*City of Freeport,* 108 So. 3d at 690. Decisions related to upgrades or improvements are a planning-level function for which there is no tort liability. *Kaweblum ex rel. Kaweblum v. Thornhill Estates Homeowners Ass'n,* 801 So. 2d 1015, 1016 (Fla. 4th DCA 2001).

Here, the City argues that it had no duty to test property that it never intended to develop. In 1997, it evaluated redevelopment of the incinerator and wastewater treatment site. It directed its engineers to perform Phase I and II environmental testing. One soil sample detected arsenic. The property was fenced to restrict access, which the Hintons' expert agreed is an acceptable control. The City decided not to redevelop at that time and did not revisit possible redevelopment until 2000.

The City contends that it has complete immunity for any failure to act beginning in 1997 because the decision not to develop at that time was discretionary and the decision not to conduct further testing was discretionary where there was no proof of migration of harmful contaminants. The City does not explain how this argument relates to each of the Hintons' claims. The City simply states that whether to redevelop the Lincoln Park site was a planning-level function and the Hintons have not identified any actions that could give rise to liability.

The Hintons answer that their claims are based upon the City's failure to contain the contamination, remediate the site, and notify residents of

11

contaminated conditions. Like any private property owner, the City had a duty to maintain the property in a reasonably safe condition. *See, e.g., Avallone v. Bd. of Cty. Comm'rs of Citrus Cty.*, 493 So. 2d 1002, 1005 (Fla. 1986). Citing cases involving a duty to warn of a dangerous condition, the Hintons argue that at the very least there is a factual question about the City's responsibility for contamination on the Hintons' properties. The Hintons maintain that questions about the City's failure to warn and about liability for contamination spreading from City property are issues for a jury.

The City has not shown that any particular claim or specific allegations of negligence are completely barred as planning-level functions. The City suggested that it took appropriate action for a vacant industrial site by fencing it. But, the disputed area includes the former elementary school and a public park. Whether the results of the 1997 testing gave rise to a duty to test further, to warn of a hazardous condition, or to remediate or secure contamination involve disputed questions of fact. The City has not shown that it is entitled to immunity as a matter of law for planning-level decisions.

### Conclusion

We affirm the denial of summary judgment on the medical monitoring claim and the trial court's ruling that the City is not entitled to summary judgment on its claim that it was engaged in planning-level functions. We dismiss for lack of jurisdiction questions about whether the damage caps in section 768.28(5) apply and as to how many incidents or occurrences the Hintons may be entitled to recover. We dismiss as untimely the City's challenge to the section 376.313 claim. Finally, we dismiss for lack of jurisdiction the challenge to the sufficiency of the takings claim.

*Affirmed in part; dismissed in part.*

CONNER, FORST and KLINGENSMITH, JJ., concur.

*         *         *

**Not final until disposition of timely filed motion for rehearing.**